876 P.2d 1278

Francis R. CALLEON, Plaintiff–
Appellee/Cross–Appellant,

v.

Hiroo W. MIYAGI and MTL, Inc.,
Defendants–Appellants/Cross–
Appellees,

and

John Does 1–10, Jane Does 1–10, Doe Part-
nerships 1–10, Doe Corporations 1–10,
and Doe Entities 1–20, Defendants.

No. 16261.

Supreme Court of Hawai‘i.

May 10, 1994.

As Amended on Grant of Reconsideration on
July 15, 1994.

Honolulu, for defendants-appellants/cross-appellees MTL, Inc. and Hiroo W. Miyagi on the answer.

Craig K. Shikuma & Brian D. Sugimoto of Sugimoto, Moniz & Shikuma and Jerry M. Hiatt and Gregory Tom of Bays, Deaver, Hiatt, Kawachika & Lezak, Honolulu, for plaintiff-appellee/cross-appellant Francis R. Calleon.

Before MOON, C.J., NAKAYAMA and RAMIL, JJ., DANIEL G. HEELY, Circuit Judge, in place of KLEIN, J., recused, and GAIL C. NAKATANI, Circuit Judge, in place of LEVINSON, J., recused.

MOON, Chief Justice.

Defendants-appellants / cross-appellees MTL, Inc. (MTL) and Hiroo W. Miyagi, its president and general manager, appeal from a judgment entered pursuant to a jury verdict in favor of plaintiff-appellee/cross-appellant Francis R. Calleon on his claims for wrongful termination and defamation. The jury assessed both compensatory and punitive damages against MTL and Miyagi in favor of Calleon on his claims of breach of an implied employment contract, defamation, and intentional and/or negligent infliction of emotional distress. The court also assessed prejudgment interest against MTL and Miyagi.

Following entry of the trial court's judgment, Calleon moved for a judgment notwithstanding the verdict (JNOV) on the public policy and whistleblower claims that the jury had found against him. MTL and Miyagi also moved for a JNOV or a new trial on those claims which the jury had found in favor of Calleon. The trial court denied both motions. MTL and Miyagi appeal from the trial court's judgment in favor of Calleon; Calleon cross-appeals from the order denying his motion for a JNOV.

We now vacate the trial court's judgment and remand for a new trial on the issues of an implied contract of employment, defamation, intentional infliction of emotional dis-

W. Gregory Chuck and Alexander T. MacLaren of Chuck, Jones & MacLaren,

tress, negligent infliction of emotional distress, damages, and prejudgment interest. On all other claims, we affirm.

## I. BACKGROUND

Most of the salient facts in this case remain in dispute. The principal undisputed facts are as follows:

Until December 1991, MTL, a private corporation, had a contract with the City and County of Honolulu (the City) to operate the City's bus system. The City oversaw MTL's operation through its Department of Transportation Services (DTS). The City actually owned all the buses and other equipment utilized by MTL; all of MTL's operating expenses, including parts and supplies, were paid for with city funds. MTL employees were also paid by the City. MTL's contract with the City was not long-term; at intervals of from three to five years, the City would put the contract out for competitive bid. In 1991, MTL lost the contract to Oahu Transit Services, Inc. (OTS).

In 1984, Calleon left his former job at Hawaiian Telephone Company and was hired by then-President of MTL, Albert Moniz, as MTL's new General Superintendent of Maintenance, one of the highest executive level management positions in the company. In that capacity, Calleon was responsible for over 470 buses, three major repair shops, over 300 employees, and an annual budget of approximately twenty-seven million dollars. He was also placed in charge of MTL's storeroom, whose personnel were responsible for ordering and storing all of MTL's parts and supplies. Calleon's executive position was at-will; no contract of employment was contemplated or executed.

Moniz was subsequently replaced by Miyagi, who had been MTL's Vice–President. Following a disagreement relating to the order of some parts for MTL buses, Miyagi removed the supervision of the storeroom from Calleon in August 1988. Thereafter, Calleon and Miyagi's working relationship deteriorated further and, on December 5,

1988, Calleon's employment with MTL was terminated by a letter to him from Miyagi. Although MTL maintains that Calleon was sent a formal letter of termination, Calleon claims that Miyagi demanded his resignation. Apparently, no reason was given for Calleon's termination. MTL states that "[n]o one contended that Calleon failed to put forth his best efforts as a top executive at MTL or that he failed to do his job in running the Maintenance Department. He simply did not get along with the boss."

When Calleon was fired, a "change of status" form was prepared for MTL's own files, signed by Miyagi, in which the reason for Calleon's termination was given as "insubordination." In January 1989, in answer to a request from the City regarding the reason for Calleon's firing, MTL stated that Calleon had been fired for insubordination. The same reason was apparently also given by Calleon's replacement to several middle-level managers who had formerly worked for Calleon.

The remaining salient facts are in dispute. Calleon claims that he was fired in retaliation for having attempted to stop a purchase order for certain replacement parts for city buses called "re-ring kits." According to Calleon: (1) this specific order was placed in May 1988 with the Muncie Company (Muncie), a re-ring kit supplier, only because Muncie had been a long-time contributor to the political campaigns of Honolulu's mayor, Frank Fasi; (2) the required price check and comparison was not made by the storeroom's superintendent, Walter Isobe; and (3) he subsequently stopped the order and demanded a price check, ultimately finding that the kits could indeed be purchased at a lower price from Muncie's main competitor, Hicklin. Calleon maintains that as a result, Miyagi removed the storeroom from Calleon's control in August 1988.

The parties agree that, subsequent to August 1988, relations between Miyagi and Calleon went from bad to worse. There was at least one meeting between the two men in October 1988, although there is no agree-

ment as to what transpired at that meeting. Miyagi claims that he attempted to explain to Calleon his reasons for shifting responsibility for the storeroom. Calleon, on the other hand, claims that "Miyagi became angered when he realized that Calleon had exposed Miyagi's lie about the transfer of the store-room[.]"

Calleon also claims that he was fired because he alerted the City to possible safety hazards due to a shortage of bus drivers caused by a hiring freeze instituted by Miyagi in 1988 as a cost-cutting measure. Although Calleon maintains that he alerted the City in October 1988, MTL contends that Calleon did not report anything to the City until after he was fired, in an effort to provide more apparent evidence for his alleged wrongful termination. MTL further claims that there was in fact no safety problem due to the hiring freeze.

Finally, Calleon claims that he was fired because he complained to Miyagi about allegedly rigged inventory counts at the "Alapai storeroom" (apparently not the main storeroom). Calleon claims that Miyagi just "shrugged it off." However, MTL contends that discrepancies between actual physical inventory and the records of such inventory are normal for the size and extent of MTL's operation, and that, in any event, Calleon's reporting of such discrepancies to Miyagi had nothing to do with his firing.

MTL maintains that what had previously been a good working relationship between Calleon and Miyagi began to deteriorate after Miyagi "passed over" Calleon for promotion to the number two executive position at MTL in March 1988. After Miyagi took over the operation of the storeroom in August 1988, the relationship between the two men deteriorated further. MTL claims that Calleon, on several occasions, publicly disparaged Miyagi and also "published statements to city officials" that Miyagi was incompetent. Eventually, the two men stopped talking to one another.

MTL submits that Miyagi decided to terminate Calleon because this intractable situation between the company president and one of his chief executives could not continue. MTL claims that prior to firing Calleon, Miyagi had discussed his decision with his other top executives and with MTL's board, all of whom agreed that Calleon should be terminated. As already noted, Miyagi fired Calleon on December 5, 1988.

On March 31, 1989, Calleon filed suit in the First Circuit Court against both MTL and Miyagi, individually, claiming that: (1) he had been fired in violation of public policy; (2) he had been fired in violation of the Whistleblowers' Protection Act, Hawai'i Revised Statutes (HRS) § 378–62 (1985); (3) MTL owed him for losses incurred from his firing under the doctrine of promissory estoppel; (4) MTL had breached an implied contract of employment by firing him; (5) MTL had defamed him; (6) MTL had engaged in intentional and/or negligent misrepresentation and/or fraud in firing him; and (7) MTL had intentionally and/or negligently caused him emotional distress for which it must compensate him.

Pursuant to the jury verdict, the trial court, on May 6, 1992, entered judgment against Calleon on the public policy, whistleblower, promissory estoppel, and intentional/negligent misrepresentation counts, and in Calleon's favor on the counts of MTL's and Miyagi's violation of an implied employment contract, defamation (against MTL only), and intentional and/or negligent infliction of emotional distress. The judgment ordered (1) MTL and Miyagi, jointly and severally, to pay Calleon $450,000.00 in special and general compensatory damages; (2) MTL to pay Calleon $100,000.00 and Miyagi to pay Calleon $50,000.00 in punitive damages; and (3) both MTL and Miyagi, jointly and severally, to pay Calleon prejudgment interest on the compensatory damages at the rate of ten percent from January 1, 1989 to the date of judgment.

On May 8, 1992, Calleon moved for a JNOV on his public policy and whistleblower claims. On May 15, 1992, MTL and Miyagi moved for a JNOV or, in the alternative, a

new trial, and for remittitur. The trial court denied both motions on July 2, 1992 and July 6, 1992, respectively. On July 7, 1992, MTL and Miyagi (hereinafter, collectively MTL) timely filed their notice of appeal to this court, and on July 21, 1992, Calleon timely filed his notice of cross-appeal.

## II. *DISCUSSION*

MTL raises the following points on appeal: (1) the trial court erroneously instructed the jury on the issue of an implied contract; (2) the court erroneously allowed into evidence prior investigations of allegations that certain MTL managers were illegally diverting MTL materials for personal use; (3) Moniz was erroneously allowed to testify concerning federal employment law; (4) the court erroneously allowed the jury to decide whether a defamation privilege existed in this case; (5) as a matter of law, the evidence did not support a verdict for intentional infliction of emotional distress; further, the court erroneously instructed the jury on the issue of negligent infliction of emotional distress; (6) the jury was erroneously allowed to calculate damages to Calleon as extending beyond the December 1991 date on which MTL's contract with the City ended; (7) the punitive damage award was not supported by the evidence; and (8) prejudgment interest should not have been awarded.

Calleon has cross-appealed from the trial court's judgment, asserting that the court erred in not granting his motion for a JNOV on his claims of violation of public policy and the whistleblowers' protection act because "the overwhelming evidence proved Calleon's claims." Calleon further contends that the jury erred in finding for Miyagi individually on the defamation claim.

### A. *Jury Instructions*

█ MTL's three major contentions of trial court error concern the issues of an implied employment contract, defamation, and intentional/negligent infliction of emotional distress. On each issue, MTL essentially contends that the trial court committed reversible error by incorrectly instructing the jury. This court has stated "the general rule of law that '[e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record that the error was not prejudicial.'" *Quedding v. Arisumi Bros., Inc.*, 66 Haw. 335, 340, 661 P.2d 706, 710 (1983) (citations omitted).

### 1. **Implied Employment Contract**

The jury found that in firing Calleon, MTL had breached an implied contract of employment. In count IV of his complaint, Calleon specifically stated the theory of his implied contract claim:

[MTL's] termination of Calleon's employment violated, and was a breach of, various written and unwritten personnel procedures (the "Procedures"), some of which are reflected in the MTL Employee Manual ("Manual"). Calleon was provided with a copy of the Manual and was aware of the Procedures because he was a management level employee. He was entitled to and did rely upon the Manual and the Procedures pursuant to the holding in *Kinoshita v. Canadian Pacific Airlines*, 68 Haw. [594], 724 P.2d 110 (1986).

[MTL] did not follow either the Manual or the Procedures in the termination of Calleon's employment. [MTL] thereby materially breached the contract created by the Procedures and the Manual in the termination of Calleon's employment.

In *Kinoshita*, two part-time passenger agents employed at-will by Canadian Pacific Airlines (CPA) were fired in 1982, after having been implicated in a drug smuggling conspiracy. Upon their firing, both employees were informed by CPA that they would not be allowed to appeal their discharges because of the seriousness of the charges against them. However, in 1978, CPA had voluntarily promulgated employee rules, which included the following specific provisions:

26.01 Employees who consider themselves unfairly treated shall have the right

to file a grievance detailing the complaint and requesting a hearing.

. . . .

26.05 Should no decision be given within the time specified, or the decision be unsatisfactory, the employee may appeal progressively to the Department Head, applicable Vice–President and, in turn, to the President or his designated representative.

*Id.* at 598, 724 P.2d at 114. Moreover, in 1979, CPA had sent a circular to all its employees, stating that " 'our written employment arrangements with you . . . constitute[ ] an enforceable contract between us under [the] labour law of the state in which you work. Thus your rights in your employment arrangement are guaranteed.' " *Id.* (footnote omitted).

Both fired employees filed suit, claiming, among other things, that CPA had breached an employment contract based on the promulgated employee rules. The lawsuit was removed to federal court, where the contract claim was dismissed. The employees appealed to the federal Ninth Circuit, which certified to this court the question whether the employee rules constituted a contract enforceable by CPA's employees. *Id.* at 597, 724 P.2d at 113.

■ We began our discussion of the issue by stating that, contrary to a few other courts, "[w]e were unwilling 'to imply into each employment contract a duty to terminate in good faith [and thereby] subject each discharge to judicial incursions into the amorphous concept of bad faith.' " *Id.* at 600, 724 P.2d at 115 (citation omitted). However, we noted that some courts in other jurisdictions have "decided that the previously unfettered right of employers to discharge [at-will] employees 'can be contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees.' " *Id.* at 601, 724 P.2d at 115–16 (citation omitted). Adopting the reasoning of the Washington Supreme Court in *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219,

685 P.2d 1081 (1984), we ruled that if an employer promulgates employee rules that provide for " '*specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship[.]' " *Id.* at 602–03, 724 P.2d at 116–117 (emphasis in original) (quoting *Thompson,* 102 Wash.2d at 230, 685 P.2d at 1088).

Applying this rule in *Kinoshita,* we concluded that CPA's promulgated employee rules did, in fact, include "promises of specific treatment in specific situations," and that CPA had also clearly encouraged its employees to rely on the promulgated rules. *Id.* at 603, 724 P.2d at 117. Consequently, we held that CPA's employee rules did constitute a contract under which CPA was bound to follow those provisions concerning specific treatment in specific situations set forth in the rules. We implicitly held that CPA had breached such contract when it refused to allow the fired employees to appeal their terminations as set forth in the rules.

■ In the instant case, Calleon introduced into evidence a "personnel policies and procedures manual" promulgated by the "executive office" of MTL and specifically addressed to MTL's "managerial staff." In the introduction to the manual, the managerial staff was informed that

[i]n your management/supervisory position, you will find the guidelines in MTL's . . . manual helpful as well as necessary. It is important to remember that these are guidelines meant to apply in all situations. Specific actions and procedures are at your discretion and direction in your capacity as a manager or supervisor.

In short, the manual was meant to guide managers and supervisors in their work relationships with the employees under their supervision. However, there were very few specific procedures included in the manual; none specifically concerning employee termination. Despite the lack of such employee termination procedures, Calleon argued at

trial that the manual created an implied employment contract between MTL and himself, which MTL breached when it fired him.

Regarding the breach of implied contract claim, the trial court partially instructed the jury as follows:

> If an employer creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations, and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.

> An employer['s] manual and guidelines can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee.

> This is the law even though the statement of policy is signed by neither party[,] can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his or her job description or compensation, and even though no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring.

The language of the aforementioned instruction is virtually identical to the language contained in *Kinoshita*. Accordingly, MTL could have no legitimate objection to this part of the court's implied contract instruction. Even though the manual at issue does not appear to meet the requirements of *Kinoshita*, it was proper for the jury to consider the manual and decide whether Calleon had proven his case.

However, the trial court continued such instruction with the following language:

> A promise may be implied by the totality of the parties' relationship. In such case, the following factors may be considered: One, the duration of plaintiff['s] employment; two, commendations and promotions

received by plaintiff; three, the lack of any direct criticism of plaintiff's work; four, assurances given to plaintiff; five, defendants' acknowledged policies; six, the prior practices of the company; seven, the treatment of fellow employees; eight, employee manuals or handbooks.

MTL contends that this part of the court's implied contract instruction was erroneous because it is clearly not based on any applicable Hawai'i law.

Calleon freely admits that the portion of the instruction at issue is based on a California case, *Pugh v. See's Candies, Inc.,* 116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981). Calleon does not urge this court to adopt the principles of *Pugh;* instead, he simply states that "[t]he law required the jury to consider the totality of circumstances of Calleon's employment." Because *Pugh* is obviously not the law in this jurisdiction, Calleon is simply mistaken.

Moreover, *Pugh* concerns a different type of implied contract claim than the one we recognized in *Kinoshita*. In *Pugh*, a vice-president in charge of production (Pugh) at See's Candies (See's), who had worked his way up from his initial position as a dishwasher and had been employed by the company for thirty-two years, was abruptly fired with no notice and no reason given. He presented evidence at trial that he had received assurances over the years from several presidents of the company that his future was secure. He also claimed that he had never received anything but commendations for his work and that there had never been any complaints about him.

After determining that Pugh's firing did not violate public policy, the court noted that according to applicable California law, " '[i]t is settled that contracts of employment ... are terminable only for good cause if ... the parties agree, expressly or impliedly, that that employee could be terminated only for good cause.' " *Id.* at 326, 171 Cal.Rptr. at 925 (citations omitted). The *Pugh* court then listed factors which would determine whether "an implied-in-fact promise for some form of

continued employment" existed in a given case, including "[1] the personnel policies or practices of the employer, [2] the employee's longevity of service, [3] actions or communications by the employer reflecting assurances of continued employment, and [4] the practices of the industry in which the employee is engaged." *Id.* at 327, 171 Cal.Rptr. at 925–26. The court also included as factors "[5] the commendations and promotions received [and] [6] the apparent lack of any direct criticism of [the employee's] work." *Id.* at 329, 171 Cal.Rptr. at 927. Applying these factors to the case before it, the court held that Pugh had succeeded in establishing a *prima facie* case for the existence of an implied contract under which See's could not fire him without good cause. *Id.*

Thus, the specific claim contained in *Pugh* is an implied contract according to which an employer cannot fire an employee for other than good cause. By contrast, the implied contract in *Kinoshita* merely provides that the employer must adhere to any specific procedures meant to apply to specific situations contained in an employer-promulgated manual or handbook upon which an employee has relied. *Kinoshita* does not provide that the firing must be for good cause, but only that any specific promulgated procedures must be followed.

Consequently, because neither the specific claim nor the factors regarding that claim contained in *Pugh* have been adopted in this

jurisdiction, that part of the trial court's instruction, based on *Pugh,* was manifestly erroneous. Although we could take this occasion to expressly adopt the holding and the reasoning of *Pugh* and recognize the possibility in this jurisdiction of an implied employment contract under which an employer could only discharge an employee for good cause, we decline to do so.

We have expressly refused to follow a minority of other jurisdictions in implying a good faith requirement into every employment situation,[1] thereby " 'subject[ing] each discharge to judicial incursions into the amorphous concept of bad faith.' " *Kinoshita,* 68 Haw. at 600, 724 P.2d at 115 (citation omitted).[2] We further believe that to adopt the principle of a good faith implied employment contract based on the *Pugh* factors would be tantamount to implying some kind of good faith requirement into every employment situation and would essentially mean the end of at-will employment. This is a result we cannot countenance.

Because we decline to adopt the *Pugh* factors, which the trial court included as part of its jury instruction on the implied contract claim, such inclusion was manifestly erroneous and prejudicial to MTL. Accordingly, we must vacate the trial court's judgment on this issue and remand for a new trial with jury instructions restricted to the *Kinoshita* implied employment contract rule.[3]

## 2. Defamation

Although MTL does not deny on appeal that it defamed Calleon, the company con-

---

**1.** The *Pugh* court itself recognized the difficulties involved in any judicial inquiry of an employer's "good faith" in firing an at-will employee. The court noted that under the *Pugh* principle, an employee's ultimate burden of showing lack of good faith on the employer's part depended on the interpretation of a term—"good faith"—which " 'ha[s] been found to be difficult to define with precision and to be largely relative in [its] connotation, depending upon the particular circumstances of each case.' " *Id.* at 330, 171 Cal.Rptr. at 928. Because of this difficulty in interpretation and application, the *Pugh* court further cautioned that "[c]are must be taken ... not to interfere with the legitimate exercise of managerial discretion. 'Good cause' in this context is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term." *Id.*

**2.** It is noteworthy in this regard that when we decided *Kinoshita* in 1986, the 1981 *Pugh* decision was presumably readily available for our consideration.

**3.** This disposition of the implied contract issue moots MTL's claim that the trial court erroneously allowed into evidence prior company investigations of managerial personnel suspected of using company supplies for personal use. However, because such evidence was clearly irrelevant to the *Kinoshita* implied contract rule, the court erred in admitting it for that purpose. On remand, it is within the trial court's discretion to admit such evidence for any other relevant purpose.

Also rendered moot is MTL's claim that Moniz was erroneously allowed to testify concerning his belief about the requirements of a federal em-

tends that the trial court made several errors in its handling of the defamation claim, including a failure to properly instruct the jury. We agree with MTL that the trial court committed reversible error in instructing the jury on Calleon's defamation claim. Therefore, all of MTL's other contentions regarding the issue are moot, and we must vacate the trial court's judgment as to the defamation claim and remand the issue for a new trial.

The trial court instructed the jury on the defamation issue as follows:

> Under the law of defamation in Hawai'i, a qualified privilege arises when an author of the defamatory statement reasonably acts in discharge of some public or private duty and where the publication contains subject matter in which the author has an interest and the recipients of the publication have a corresponding interest or duty.

> A qualified privilege is conditional and is lost if it is abused. A qualified privilege may be abused by one, excessive publication; two, use of the occasion for an improper purpose; or three, lack of belief or grounds for belief in the truth of what is said.

The trial court thus allowed the jury to determine whether, according to the facts of the present case, MTL possessed a qualified privilege to defame Calleon.

■ The trial court clearly erred, to MTL's prejudice, by leaving to the jury the determination of the existence of a qualified privilege. In *Kainz v. Lussier*, 4 Haw.App. 400, 667 P.2d 797 (1983), the Intermediate Court of Appeals (ICA) unequivocally stated that "[w]hether the [defamatory] communication was privileged is an issue of law to be

determined by the court." *Id.* at 405, 667 P.2d at 802 (citations omitted).

In other words, the court must first decide, as a matter of law, the threshold question whether the qualified privilege exists under the facts of the case. If the court decides that the defendant possessed the qualified privilege, it must then declare the existence of the privilege as a matter of law and submit the abuse of privilege issue to the jury for determination.

The trial court in the instant case abdicated its responsibility by allowing the jury to determine the existence or non-existence of the privilege. There is arguably ample evidence in the record to support the conclusion that MTL possessed the privilege. It is thus possible that the trial court would have so concluded had it properly construed the law.[4] However, it is also possible that the jury failed to find the existence of the privilege, and that it, therefore, never considered the abuse of privilege issue, to MTL's clear prejudice. Because there is obviously no way of knowing what would have happened in this case had the trial court properly applied the law, such uncertainty requires that we vacate the judgment on the defamation claim and remand the issue for a new trial, with the proper allocation of responsibility between the trial court and the jury on the privilege and abuse of privilege issues.

### 3. Infliction of Emotional Distress

■ Because we conclude that the trial court's judgment in favor of Calleon on both the implied contract claim and the defamation claim must be vacated and remanded for new trial, it follows that we must also vacate and remand the court's judgment in favor of Calleon with respect to his claim of intention-

---

ployment statute. However, because Moniz's testimony was clearly irrelevant to all of the issues being tried, the trial court also erred in allowing it into evidence.

4. For example, when MTL "published" Calleon's alleged "insubordination" to the City, it was at the City's request. MTL would have good reason for claiming that both the author and the recipient in this case were interested parties and that

MTL was reasonably acting in the discharge of its duty by reporting to the City. Likewise, MTL could argue that when Calleon's successor told several middle-level managers who had formerly worked for Calleon that he had been fired for insubordination, Calleon's successor was discharging a duty to those now working under him and that all parties had an interest in the subject matter of the alleged defamation.

al infliction of emotional distress (IIED) and/or negligent infliction of emotional distress (NIED). Although both IIED and NIED are independent torts, there still must be some underlying intentional or negligent action undertaken by the defendant in order to render the IIED/NIED claim cognizable. Because MTL was absolved on every one of Calleon's claims except implied contract and defamation, the jury must have predicated its finding on the IIED/NIED claim upon its prior determination of MTL's liability on either the implied contract claim or the defamation claim, or both. By vacating and remanding the IIED/NIED claim for new trial, MTL's contention that the trial court erroneously instructed the jury on NIED is rendered moot. However, to assist the trial court on remand, we will address MTL's argument regarding erroneous instructions as well as another issue concerning instructions not previously raised by either party.[5]

■ The trial court instructed the jury on NIED as follows:

> The elements of a cause of action for negligent infliction of serious emotional distress are[:] first, the defendant engaged in negligent conduct;
>
> Second, the plaintiff suffered serious emotional distress;
>
> Third, such negligent conduct of the defendant was a legal cause of the serious emotional distress.

MTL contends that under Hawai'i law, there must be an underlying physical injury to either a person or property in order for an NIED claim to be cognizable. Because the trial court's instruction failed to include any mention of this physical injury requirement, MTL contends that such instruction was fatally flawed.

In *Chedester v. Stecker*, 64 Haw. 464, 643 P.2d 532 (1982), plaintiffs-appellees homeowners claimed that defendant-appellant homeowners' association had, among other things, intentionally and negligently caused them to suffer serious emotional distress by continually and obnoxiously requesting payment of a water line assessment fee. The trial court dismissed the IIED claim, but submitted to the jury the claim for NIED. The jury found for the plaintiffs. The association appealed claiming that "absent some physical injury to person or property, there can be no recovery for the [NIED]." *Id.* at 464, 643 P.2d at 533.

Although we decided that the trial court should have allowed the IIED claim to go to the jury, we also agreed that a cognizable claim for NIED requires a physical injury to either a person or property:

> The cases in this jurisdiction which have allowed, in negligence actions, recovery of damages for his or her emotional distress, by one not physically injured, have all involved some physical injury to property or a person.[6] Where damages for emotional distress are allowed in the absence of a physical injury, such as in actions for malicious prosecution, malicious abuse of discretion, false imprisonment and the like, the tort has been an intentional one. Accordingly, we hold the court below erred in sending the count with respect to the [NIED] to the jury.

*Id.* at 468, 643 P.2d at 535. We therefore vacated the jury's verdict on the NIED claim and remanded the case for a new trial on the IIED claim. *Id.*

Pursuant to our holding in *Chedester*, MTL has correctly asserted that the trial court erroneously instructed the jury on Calleon's claim for NIED. On remand, the jury instruction concerning NIED should contain the requirement of physical injury to a person, if Calleon is able to demonstrate such injury. If Calleon is unable to do so, the NIED claim should not go to the jury.

---

**5.** MTL makes several other arguments as to why this court should reverse the judgment in favor of Calleon on the IIED/NIED claim, including insufficiency of the evidence and privilege. All of these arguments are also moot.

**6.** We note that the legislature superseded the caselaw allowing NIED for damage solely to property in 1986. *See* HRS § 663–8.9 (Supp. 1992).

■ Although not raised or addressed by the parties, we note that it was error for the trial court not to have separated the IIED and NIED claims for the jury's consideration. Although a plaintiff may join separate claims under a single count in his or her complaint, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 8(e), the trial court must separate those claims before submitting the issues to the jury, especially when they concern two different torts with significantly different requirements for liability.[7] Because the trial court neglected to do so in the instant case, it is impossible to determine whether the jury found MTL liable for IIED, NIED or both. On remand, if the evidence requires that both the IIED and NIED claims be presented to the jury, the trial court is instructed to separate the two claims for the jury's consideration in relevant instructions and on the verdict form.

### B. *Damages and Prejudgment Interest*

Because MTL's remaining contentions all involve the award of damages to Calleon premised on the trial court's judgment in his favor on the implied contract, defamation, and the IIED/NIED claims, and because the judgment on all three of these claims must now be vacated and remanded, MTL's remaining contentions are all necessarily moot. However, because these issues will undoubtedly surface on remand, we shall discuss them here.

■ MTL contends that the jury should not have been able to consider compensatory damages for Calleon based on any wages he might have earned after December 1991, when MTL lost the contract for the City's bus system. MTL argues that because Calleon was a senior executive, he necessarily would not have been re-hired by the new company taking over the bus contract.

However, as Calleon correctly points out, the jury was presented evidence that the new company could have decided to retain certain senior executives because of their experience, or for other reasons. For example, there was testimony that other former MTL managerial personnel had, in fact, been retained by OTS. It was therefore proper for the jury to determine whether, and for how long, Calleon might have remained employed even after MTL had lost the contract and to calculate a damage award based on that determination. However, because of our holding on the liability aspect of Calleon's claim, the instant compensatory damage award must be vacated and remanded.

MTL argues that the punitive damages awarded to Calleon by the jury were not supported by the requisite clear and convincing evidence and that remittitur was necessary. Given the disposition of this case, MTL's punitive damages argument is simply moot, and the instant punitive damages award must be vacated and remanded.

■ Finally, MTL claims that the trial court erroneously awarded prejudgment interest to Calleon, citing our decision in *Leibert v. Finance Factors, Ltd.*, 71 Haw. 285, 788 P.2d 833, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1990), for the proposition that where punitive damages have been awarded in an amount in excess of the applicable amount of prejudgment interest, such interest should not be awarded. MTL notes that a total of $150,000.00 in punitive damages was awarded in this case, as opposed to $135,000.00 in prejudgment interest.

However, as Calleon correctly points out, *Leibert* specifically concerned a treble damages award pursuant to HRS chapter 480 in a lawsuit involving unfair and deceptive business practices and not a punitive damages award. *See* Stand.Comm.Rep. No. 661, in 1969 House Journal, at 882–885 ("purpose of this bill is to encourage those who have been victimized by persons engaging in unfair or deceptive acts or practices to prosecute their claims by establishing a minimum recovery of $1,000 from persons violation Chapter 480 of the [HRS]"); *see also* Conf.Comm.Rep.

---

7. IIED requires that the acts be "unreasonable," that is, "without just cause or excuse and beyond all bounds of decency." *Chedester,* 64 Haw. at 468, 643 P.2d at 535.

**322**

No. 19, in 1961 Senate Journal, at 1054 (Chapter 480 "is not intended to be punitive in nature"). *Leibert* thus cannot stand for the general proposition claimed by MTL.

Moreover, the purpose of prejudgment interest is to discourage "recalcitrance and unwarranted delays in cases which should be more speedily resolved." Conf.Comm.Rep. No. 67, 1979 Sen. Journal at 984. "Awarding prejudgment interest on compensatory damages ... ensures that just compensation to the tort victim is not eroded by the dilatory tactics of the tortfeasor, and *comprises a sanction wholly separate from any punitive damages awarded.*" *Digital & Analog Design Corp. v. North Supply Company,* 63 Ohio St.3d 657, 660–61, 590 N.E.2d 737, 741 (1992) (emphasis added). Thus, we cannot accept MTL's contention that prejudgment interest should not be awarded simply because the amount of punitive damages in this cases exceeded the applicable amount of prejudgment interest. Although "a litigant is not entitled to prejudgment interest on the *punitive* damages portion of a judgment," *id.* at 660, 590 N.E.2d at 740 (emphasis in original), he or she is entitled to be compensated for the delay in receiving compensation for the injuries suffered, "even if that plaintiff has been awarded punitive damages in an amount that otherwise would be sufficient to compensate him [or her] for such delay." *Id.*

Consequently, the trial court was within its discretion when it awarded prejudgment interest to Calleon. In any event, the issue is moot, and the instant award of prejudgment interest must also be vacated and remanded.

## C. *Calleon's Cross–Appeal*

Finally, Calleon has cross-appealed from the trial court's judgment, claiming that the trial court erred in denying his motion for a JNOV on the public policy and whistleblower issues, and that the jury erroneously failed to find Miyagi personally liable for defamation. Because the entire defamation issue must be remanded for a new trial, Calleon's cross-appeal as to that issue is moot and need not be discussed.

With respect to the public policy and whistleblower claims, Calleon argues that, in addition to the trial court having erred in denying his JNOV motion, the jury erred in finding against him on those claims. We note that, in his original motion for a JNOV, Calleon only requested reversal of the jury verdict and entry of judgment in his favor; he did not request in the alternative for a new trial, which is clearly allowable under the rule governing JNOV motions. *See* HRCP 50(b). Thus, having elected not to seek the alternative relief in his original motion, our consideration of his cross-appeal is necessarily limited to the trial court's denial of his JNOV motion.

The JNOV standard of review in this jurisdiction is clearly set forth in *Guaschino v. Eucalyptus, Inc.,* 3 Haw.App. 632, 658 P.2d 888 (1983):

"[T]he motion for [JNOV] may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence, or there is insufficient evidence to make a 'one-way' verdict proper, [JNOV] should not be awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. And this approach governs the actions of appellate courts as well as trial courts."

*Id.* at 643, 658 P.2d at 896 (quoting 5A J. Moore & J. Lucas, *Moore's Federal Practice* § 50.07(2) (2d ed. 1982)).

In light of the foregoing standard, both Calleon's original motion for a JNOV and his appeal of the motion's denial to this court are clearly without merit. Nearly all of the significant evidence presented in this case was testimonial, with Calleon himself doing much of the testifying on his own behalf. Besides MTL's extensive cross-examination of Calleon and his other witnesses, the company itself called witnesses on its own behalf to rebut much of Calleon's testimony.

Miyagi testified that he had not fired Calleon as the result of any political machina-

tions, as Calleon had claimed. Isobe, the storeroom's superintendent, testified that, contrary to Calleon's contentions, he had, in fact, done the requisite price checks before ordering the re-ring kits from Muncie. Kenneth Hong, who during the relevant time period was the General Superintendent of Transportation at MTL, testified that there were no safety problems associated with the hiring freeze on new bus drivers. Additionally, there was testimony that Calleon himself was no stranger to political insider dealing, and that one of Calleon's principal witnesses had been previously employed by and maintained close ties with Hicklin, Muncie's chief competitor.

In short, there was ample "conflicting evidence" present in this case. A review of the record discloses that virtually every significant fact was strenuously contested at trial. Because this court must view the evidence in the light most favorable to MTL, Calleon cannot legitimately claim that on the basis of this record, "there can be but one reasonable conclusion as to the proper judgment." *Id.*

Therefore, in light of the applicable standard governing both JNOV motions and appellate review of such motions, Calleon has clearly failed to demonstrate that the trial court erred in denying his motion for a JNOV.

### III.   *CONCLUSION*

Based on the foregoing, we vacate the trial court's judgment on the implied contract, defamation, and IIED/NIED claims and remand these claims for a new trial. We also vacate and remand the trial court's judgment concerning the awards of compensatory and punitive damages to Calleon as well as the award of prejudgment interest. With respect to all other claims and the denial of Calleon's motion for a JNOV, we affirm.