947 P.2d 952

Janie DITTO, Plaintiff–Appellee,

v.

John A. McCURDY, Jr., M.D., Defendant–Appellant,

and

Karla Scarpiova, Defendant.

No. 17346.

Supreme Court of Hawai'i.

Nov. 6, 1997.

Reconsideration Denied Nov. 17, 1997.

Peter Van Name Esser, Honolulu, for defendant-appellant John A. McCurdy, Jr., M.D., on the writ.

David C. Schutter and Christopher A. Dias, (of David C. Schutter & Associates), Honolulu, for plaintiff-appellee Janie Ditto, on the answer.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

We granted defendant-appellant-petitioner John A. McCurdy, Jr., M.D.'s (Dr. McCurdy) petition for a writ of certiorari to review the decision of the Intermediate Court of Appeals (ICA) in *Ditto v. McCurdy*, 86 Hawai'i 93, 947 P.2d 961 (App.1997). For the reasons discussed below, we (1) reverse the jury's finding of liability with respect to fraud; (2) vacate the jury's award of punitive damages; and accordingly (3) remand with instructions to the trial court to dismiss the fraud count and conduct a new trial solely on the issue of the amount of punitive damages owed. In all other respects, we affirm.

## I. BACKGROUND

The facts of the underlying case are set forth in detail in the ICA's decision. *See Ditto*, at 92–95, 947 P.2d at 967–970. Briefly stated, plaintiff-appellee-respondent Janie Ditto was disfigured as a result of breast augmentation surgery performed by Dr. McCurdy, an ear, nose, and throat specialist and cosmetic surgeon. Ditto filed a complaint against Dr. McCurdy and his assistant,[1] alleging negligence and fraud and claiming punitive damages. Following a three-week trial in 1992, the jury, in its special verdict, found Dr. McCurdy liable for negligence, fraud, and punitive damages, awarding Ditto $3,500 in special damages, $1,000,000 in general damages, $400,000 in damages for fraud, and $600,000 in punitive damages.

On appeal before the ICA, Dr. McCurdy raised numerous points of error, which he asserted warranted judgment in his favor or, alternatively, a new trial. Most of his claims were rejected by the ICA. The ICA did agree, however, that the trial court abused its discretion when it allowed plaintiff's ex-

---

1. The trial court vacated the judgment against Dr. McCurdy's assistant, and she is not a party to this appeal.

pert, Don Parsa, M.D. (Dr. Parsa), to testify in rebuttal that Dr. McCurdy did not have the minimum qualifications to perform breast surgery in any Hawai'i hospital. The ICA therefore vacated the judgment on the fraud claim and remanded for a new trial on fraud.[2] Dr. McCurdy filed a timely petition for writ of certiorari, which we granted on July 3, 1997.

## II. *DISCUSSION*

### A. *The ICA's Decision*

 Relying on our decision in *Takayama v. Kaiser Foundation Hospital*, 82 Hawai'i 486, 923 P.2d 903 (1996), the ICA determined that the trial court had abused its discretion by admitting the testimony of plaintiff's expert, Dr. Parsa, in rebuttal. We disagree. Under *Takayama*, "the introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent an abuse thereof." *Takayama*, 82 Hawai'i at 495, 923 P.2d at 912 (quoting *Yorita v. Okumoto*, 3 Haw.App. 148, 156, 643 P.2d 820, 826 (1982)). In order to determine whether there is an abuse of discretion, the reviewing court must examine the sequence of the trial. *Takayama*, 82 Hawai'i at 496, 923 P.2d at 913.

#### 1. *The sequence of trial and the rebuttal testimony*

The essence of Ditto's fraud claim was that Dr. McCurdy had a duty to disclose that he was not a board certified plastic surgeon because that fact was material to Ditto's decision to allow him to perform breast augmentation surgery on her. Ditto thus had the burden of proving, *inter alia*, that Dr. McCurdy failed to disclose that he was not a board certified plastic surgeon and that it was a material fact.

Anticipating Dr. McCurdy's defense—that he was a board certified cosmetic surgeon and thus certified to perform Ditto's surgery—Ditto's expert, Ralph Lassa II, M.D.

(Dr. Lassa), a board certified plastic surgeon, testified during Ditto's case-in-chief about the differences in certification procedures between the two boards. In part, his testimony was that certification by the American Board of Cosmetic Surgeons (ABCS) was not recognized by the American Society of Medical Specialties (ASMS), unlike certification by the American Board of Plastic and Reconstructive Surgeons (ABPRS), because the requirements for ABCS certification were not as rigorous as those of the ABPRS.

In support of his defense, Dr. McCurdy called Randolph Howes, M.D. (Dr. Howes), a trustee of ABCS, whose testimony was essentially that the ABCS qualification criteria were equally as rigorous as those of any certifying board, but that there was a turf war going on, and, for selfish reasons, plastic surgeons were trying to keep cosmetic surgeons from being recognized. Dr. Howes also testified that, although he was certified by the ABCS and not by the ABPRS, he held surgical privileges at thirteen hospitals.

When Ditto's counsel attempted to cross-examine Dr. Howes regarding hospital privileges for cosmetic surgeons, Dr. McCurdy's counsel objected. The trial court allowed the question over Dr. McCurdy's objection; however, when it became apparent that Dr. Howes did not know the prevailing practice in Hawai'i hospitals, the trial court struck the testimony. On re-direct examination of Dr. Howes, the following exchange occurred:

Q. [by McCurdy's counsel]: In connection with hospital privileges do you have some familiarity with regard to the peer review committee in the State of Louisiana and what their considerations are in terms of admitting doctors to practice surgery in the hospitals?

A. [Dr. Howe]: Yes, I do.

Q. Contained within that knowledge do you have an understanding as to whether the peer review committee determines whether surgeons are only permitted to

---

**2.** Specifically, the ICA: (1) affirmed the portion of the judgment awarding special, general, and punitive damages on the negligence claim; (2) reversed the portion awarding prejudgment interest on punitive damages; (3) and vacated and remanded the remainder of the judgment awarding fraud damages and prejudgment interest on compensatory damages. *See Ditto*, at 119–120, 947 P.2d at 994–995.

perform surgery within their particular board certification, or what information do you have on that subject?

[Ditto's counsel]: Objection on relevancy grounds, Your Honor.

THE COURT: [Counsel]. You're talking about Louisiana?

[McCurdy's counsel]: Yes.

[Ditto's counsel]: Same objection.

[McCurdy's counsel]: I withdraw the question.

Q. [by McCurdy's counsel]: With regard to peer privileges at hospitals is there some nationality [sic] basis that the AMA has published in connection with the consideration of doctors, admission of doctors' privileges to perform surgery at hospitals across the nation?

[Ditto's counsel]: I will object to that. He already testified he doesn't know about Hawaii.

[McCurdy's counsel]: I have a right to question this witness about a subject that was raised for the first time on cross-examination. I didn't cover this in my direct. How can it be cumulative?

[Ditto's counsel]: What he is testifying to now, Your Honor, is the matter we discussed earlier.

THE COURT: Sustain the objection.

In her rebuttal case, Ditto called Dr. Parsa whom the defense had listed as one of its witnesses. Dr. Parsa, chief of the surgical department at Queen's Hospital, testified that the minimum credentials for a surgeon to perform breast augmentation surgery at Queen's includes three years of general surgery residency and two years of plastic surgery residency. After reviewing Dr. McCurdy's resume, Dr. Parsa was asked whether it "would be correct that he does not meet the minimum qualifications to perform breast augmentation surgery at the Queen's Medical Center." Dr. Parsa hedged, repeated the minimum qualifications a few times, and finally answered, "[b]ut to answer your question, the answer is no, he wouldn't be given privileges right off." He also testified that the minimum credentials were the same at all Hawaiʻi hospitals with which he was familiar.

On cross-examination, Dr. McCurdy's counsel questioned Dr. Parsa extensively, essentially trying to elicit testimony that Dr. McCurdy's other credentials would be considered as well as whether he had the required residencies. The following exchange occurred:

Q. [by McCurdy's counsel]: I assume that if Dr. McCurdy were to file an application with the appropriate committee indicating that he was board certified by the American Board of Cosmetic Surgery, that he was an examiner with the American Board of Cosmetic Surgery, that he has performed, say, at this date a lifetime of somewhere between five hundred and one thousand breast surgeries, that the committee would not reject out of hand his application to perform breast surgery at Queen's Medical Center; is that so?

A. [Dr. Parsa]: Well, the American Board of Cosmetic Surgery is not recognized by the American Medical Association nor by the Hawaii Medical Association. And I would say that they look at it with great scrutiny.

Q. Assuming that they did just that and looked at his application with very great scrutiny, including his books and including his articles on breast surgery, would they attempt to assess his education, skill and experience in performing breast surgery?

A. That would have some impact.

Q. And would they attempt to assess that in a fashion; whereby, if he did have adequate education, skill, and experience in performing breast surgery, they would approve his application?

A. The way things stand right now, just being certified by cosmetic surgery, I think, again I am speaking as an individual who sits in these committees, as an individual, those who have come forward in other hospitals with similar boards of cosmetic surgery, that hasn't been given much credit that I can say. However, there are other aspects that have to be considered by virtue of that board not being respected by the Hawaii Medical Association nor by other re-

spected boards recognized by the American Board of Medical Specialities. Again, I am not criticizing that board. That's the way it stands. However he will be fully studied for what he is submitting to a credentials committee....

### 2. *The ICA'S interpretation of Takayama*

The ICA held that the admission of Dr. Parsa's testimony in rebuttal contravened the general rule we set forth in *Takayama* that "a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of its position to offer on rebuttal." *Ditto*, at 101–102, 947 P.2d at 976–977 (citing *Takayama*, 82 Hawai'i at 496, 923 P.2d at 913). Ditto had alleged fraud in her complaint and had presented evidence of alleged fraud through her expert, Dr. Lassa, who testified in detail on the differences between cosmetic and plastic surgeons. Because fraud had been an issue from the outset of her case, the ICA reasoned that Ditto should have called Dr. Parsa during her case-in-chief. *Id.* at 102, 947 P.2d at 977. Furthermore, the ICA was perplexed by Ditto's decision to reserve testimony about hospital privileges for rebuttal, given the possible relationship between an alleged inability to perform surgery at a hospital as a result of lack of qualifications and a physician's duty to disclose material facts to his or her patient. *Id.* Unable to discern a legitimate reason as to why Ditto did not call Dr. Parsa during her case-in-chief, the ICA concluded that "Dr. Parsa's testimony, along with Ditto's argument before the jury, prejudiced a substantial right of Dr. McCurdy by subjecting him to fraud liability in violation of the common law rule in *Takayama*." *Id.* at 26–27, at 102–103, 947 P.2d at 977–978. We disagree.

■■■ The general rule we established in *Takayama* "does not necessarily apply where evidence sought to be presented on rebuttal is 'negative of a potential defense,' even if the evidence is also confirmatory of an affirmative position upon which the party seeking to present the evidence bears the burden of proof." *Takayama*, 82 Hawai'i at 497, 923 P.2d at 914 (citations and brackets omitted). The affirmative of the issue upon which Ditto had the burden of proof was that Dr. McCurdy failed to disclose he was not a board certified plastic surgeon and that this was a material fact. Ditto did so through her own testimony and that of her expert witness, Dr. Lassa. The potential defense was that Dr. McCurdy's lack of certification was not material because there was no difference in qualifications between cosmetic surgeons and plastic surgeons.

Dr. Parsa's rebuttal testimony contradicted the potential defense by proving that, at least with respect to hospital privileges, Hawai'i hospitals recognized a difference in qualifications between cosmetic and plastic surgeons, and cosmetic surgeons could not get hospital privileges to perform breast surgery merely on the basis of ABCS certification. Thus, although the evidence could have been introduced in Ditto's case-in-chief, it was negative of Dr. McCurdy's potential defense. In other words, Ditto did not have to prove in her case-in-chief that Dr. McCurdy's credentials did not qualify him for hospital privileges; she had to prove only that his credentials or lack thereof were a material fact and that he failed to disclose it.

Finally, merely because the trial court in *Takayama* excluded the rebuttal evidence offered, it does not necessarily follow that the trial court's admission of the rebuttal evidence in this case was an abuse of discretion. The ICA appears to have interpreted *Takayama* to mean that, where evidence could have come in during a plaintiff's case-in-chief, it is necessarily an abuse of discretion to allow it in rebuttal. *See Ditto*, at 102–103, 947 P.2d at 977–978. Such interpretation, however, would require plaintiffs to anticipate and present evidence countering each potential defense during their case-in-chief.

For the above reasons, we hold that the trial court did not err by admitting Dr. Parsa's testimony in rebuttal.

### B. *A Physician's Duty to Disclose*

Dr. McCurdy argues that the ICA erred by vacating the fraud count and remanding

for a new trial on the fraud claim. He contends that the ICA should have reversed the fraud verdict because "the majority's creation of a legal duty by physicians in Hawaii to inform patients of medical board certifications they do not have before providing treatment[ ] is a policy mistake."

In essence, Dr. McCurdy's argument presumes that, as a matter of law, a physician does not have an affirmative duty to disclose his or her qualifications to a patient prior to providing treatment. We agree.

### 1. *Informed consent*

■ The type and extent of information a physician is required to disclose as a matter of law is governed by the doctrine of informed consent. It is well established that the doctrine of informed consent imposes an affirmative duty upon physicians or surgeons to fully disclose to a patient "the types of risks and alternatives" to a proposed treatment or surgery. *Keomaka v. Zakaib,* 8 Haw.App. 518, 523, 811 P.2d 478, 482 (quoting Linda S. Martell, Note, *Leyson v. Steuermann: Is there Plain Error in Hawaii's Doctrine of Informed Consent?,* 8 U. Haw. L.Rev. 569, 580 (1986)), *cert. denied,* 72 Haw. 618, 841 P.2d 1075 (1991). *See* Hawai'i Revised Statutes (HRS) § 671-3 (1993).[3]

Whether informed consent requires disclosures beyond those relating to the nature, anticipated results, risks, and alternatives of a contemplated treatment or procedure is an issue of first impression in Hawai'i. No state has ever held that the doctrine of informed consent requires disclosure of information

concerning the personal characteristics of the physician. In fact, informed consent has been held not to require disclosure of: (1) the physician's lack of experience in performing the disputed procedure, *Foard v. Jarman,* 326 N.C. 24, 387 S.E.2d 162 (1990); (2) the physician's incompetence, *Wachter v. United States,* 689 F.Supp. 1420 (D.Md.1988), *aff'd,* 877 F.2d 257 (4th Cir.1989) (applying Maryland and federal law); nor (3) the qualifications of persons providing treatment, *Abram v. Children's Hosp. of Buffalo,* 151 A.D.2d 972, 542 N.Y.S.2d 418 (N.Y.App.Div. 1989), *appeal dismissed by,* 75 N.Y.2d 865, 552 N.Y.S.2d 930, 552 N.E.2d 178 (1990). *See generally* David W. Louisell & Harold Williams, 3 *Medical Malpractice* ¶ 22.04[e] (1997) (discussing the doctrine of informed consent).

■ Under the circumstances of the present case, we decline to hold that a physician has a duty to affirmatively disclose his or her qualifications or the lack thereof to a patient. First, Dr. McCurdy was certified as, and held himself out to be, an otolaryngologist, facial surgeon, and cosmetic surgeon. He made no active representations to the contrary, nor did he conceal his qualifications from Ditto. Ditto concedes as much, given that her entire basis for fraud was based on the fact that Dr. McCurdy failed to tell her that he was not certified as a plastic surgeon.

Second, this is a matter best left to the legislature, and, more specifically, the board of medical examiners. Hawaii's statute on informed consent expressly mandates that the board of medical examiners establish

---

**3.** HRS § 671-3 provides in pertinent part:
(a) The board of medical examiners, insofar as practicable, shall establish standards for health care providers to follow in giving information to a patient, or to a patient's guardian if the patient is not competent to give an informed consent, to ensure that the patient's consent to treatment is an informed consent. The standards may include the substantive content of the information to be given, the manner in which the information is to be given by the health care provider and the manner in which consent is to be given by the patient or the patient's guardian.
(b) If the standards established by the board of medical examiners include provisions which are designed to reasonably inform a patient, or a patient's guardian, of:

(1) The condition being treated;
(2) The nature and character of the proposed treatment or surgical procedure;
(3) The anticipated results;
(4) The recognized possible alternative forms of treatment; and
(5) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including nontreatment,

then the standards shall be admissible as evidence of the standard of care required of the health care providers.

standards for physicians or surgeons to follow in disclosing information to a patient "to ensure that the patient's consent to treatment is an informed consent." HRS § 671-3(a).

We conclude, therefore, that, under the circumstances of this case, Dr. McCurdy did not have an affirmative duty to inform Ditto of his qualifications or the lack thereof—specifically that he was not a plastic surgeon and that he did not have hospital privileges. Consequently, Ditto's claim of fraud cannot stand. We therefore (1) reverse the jury's finding of fraud and award attributed thereto, and (2) remand this case to the trial court with instructions to dismiss the fraud count.

### C. *The Jury Instructions on Fraud*

In light of our holding, we must address the trial court's unwarranted instructions to the jury on fraud and the effect, if any, such instructions may have had on the punitive damages and negligence verdicts. The trial court instructed the jury on the fraud claim as follows:

> [Instruction No. 42:] Plaintiff Janie Ditto seeks to recover damages claimed to be sustained as a result of the alleged fraud of the defendant, Dr. McCurdy, in failing to disclose the full extent of his qualifications or lack thereof. The essential elements of the fraud claimed in this action, each of which must be proved to recover damages are:
>
> 1, Dr. McCurdy must have concealed or suppressed a material fact;
>
> 2, Dr. McCurdy must have been under a duty to disclose the fact to Janie Ditto;
>
> 3, Dr. McCurdy must have intentionally concealed or suppressed the fact with the intention to defraud Janie Ditto;
>
> 4, Janie Ditto must have been unaware of the fact and not have acted as she did if she had known of the concealed or suppressed fact;
>
> 5, and finally, as a result of the concealment or suppression of the fact Janie Ditto must have sustained damages.
>
> [Instruction No. 43:] A fiduciary relationship arises when one person puts their trust and confidence in another who pos-

sesses superior skill, knowledge, training and expertise—fiduciary in nature. Fiduciary imposes on the doctor *an affirmative duty* to exercise the utmost good faith, integrity, fairness, and fidelity, and *to disclose material facts to the patient regarding the doctor's qualifications to perform the procedures contemplated by the patient.*

(Emphasis added.) Because the instructions informed the jury that Dr. McCurdy had a legal duty to disclose his qualifications or lack thereof, we hold that they were erroneous.

 "[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that error was not prejudicial." *Calleon v. Miyagi*, 76 Hawai'i 310, 315, 876 P.2d 1278, 1283 (quoting *Quedding v. Arisumi Bros., Inc.*, 66 Haw. 335, 340, 661 P.2d 706, 710 (1983)), *reconsideration granted*, 76 Hawai'i 453, 879 P.2d 558 (1994).

### 1. *The jury's finding of liability for punitive damages*

 Where clear and convincing evidence exists, one circumstance in Hawai'i that warrants an award of punitive damages is when "there has been some wilful misconduct or that entire want of care which would raise presumption of a conscious indifference to consequences." *Masaki v. General Motors Corp.*, 71 Haw. 1, 11, 780 P.2d 566, 572, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989) (citation omitted). "Award or denial of punitive damages is within the sound discretion of the trier of fact." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 138, 839 P.2d 10, 36, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Absent a clear abuse of discretion, we will not reverse a trier of fact's decision to grant or deny punitive damages. *Id.* at 138, 839 P.2d at 37.

 The trial court's instruction to the jury on punitive damages read in relevant part:

> In order to establish punitive damages should be awarded against Dr. McCurdy[,]

plaintiff must have proven by clear and convincing evidence that Dr. McCurdy acted with willful misconduct *and* entire want of care which would raise presumption of consideration of indifference to the consequences of his act or omission.

We note that the trial court misstated the standard for awarding punitive damages when it used the conjunctive rather than the disjunctive in its instruction; such error, however, was harmless beyond a reasonable doubt. As stated previously, the jury needed only find *either* willful misconduct *or* entire want of care, to wit, gross negligence, in order to properly award punitive damages. *See Masaki,* 71 Haw. at 11, 780 P.2d at 572. The error merely operated to elevate the standard for awarding punitive damages, leaving Dr. McCurdy's substantive rights unaltered. In fact, the instruction erroneously afforded Dr. McCurdy more protection than required under prevailing law.

 Turning next to the jury's assessment of punitive damages, we agree with the ICA's holding insofar as we determine that there was, indeed, an abundance of clear and convincing evidence upon which the jury could rely to find that Dr. McCurdy's care of Ditto, from the outset, was grossly negligent and therefore reckless and consciously indifferent to the consequences that could arise. *See Ditto,* at 97–98, 947 P.2d at 972–973.

For example, there was substantial evidence produced at trial, which, if believed, revealed that: the medical history portion of Dr. McCurdy's consultation was woefully inadequate; Dr. McCurdy did not properly inform Ditto of the risks or complications involved in the initial surgical procedure or any of the subsequent surgical procedures; he sent Ditto home after her second surgery, despite continued complications, to make room for other patients in his recovery room; he failed to properly suture her incisions, resulting in constant bloody discharges; he failed to document medications allegedly prescribed to Ditto; he failed to properly diagnose an obvious infection; and he allowed his medical assistant to suture Dit-

to's incision when he was not physically present. . . .

"It has long been the law in this jurisdiction that verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support a jury's findings." *State Sav. & Loan Assoc. v. Corey,* 53 Haw. 132, 141, 488 P.2d 703, 709 (1971) (citations omitted), *cert. denied,* 406 U.S. 920, 92 S.Ct. 1774, 32 L.Ed.2d 119 (1972). Contrary to Dr. McCurdy's contention, there was substantial evidence on which the jury could have based its award of punitive damages. . . . We hold, therefore, that the trial court properly allowed the issue of punitive damages to be considered by the jury and that the jury did not abuse its discretion in making the award.

*Ditto,* at 97–98, 947 P.2d at 972–973.

Irrespective of the fraud count, the evidence introduced at trial relating thereto, and the instructions relating to fraud, the evidence of Dr. McCurdy's gross negligence was so overwhelming and of such an egregious nature that the jury certainly could have found that punitive damages were warranted. Furthermore, the trial court provided separate and clear instructions on negligence, punitive damages, and fraud, making any possible incidence of prejudice flowing from the fraud claim doubtful and, at most, harmless. The presumption of harm resulting from the erroneous jury instructions on fraud is therefore rebutted, and we affirm the ICA's decision upholding the jury's finding of liability for punitive damages.

### 2. *The jury's finding of negligence*

 The jury's special verdict makes it clear that the erroneous jury instructions on fraud did not prejudice Dr. McCurdy with respect to Ditto's negligence claim. In its special verdict, the jury found, *inter alia,* that (1) Dr. McCurdy was negligent in his care and treatment of Ditto, and (2) his negligence was a legal cause of injury or damage to Ditto. The jury also answered "yes" to the following interrogatory: "Was the Defendants' fraudulent conduct a legal cause of injury or damage to Plaintiff Janie Ditto *separate and apart from* any dam-

ages caused by negligence?" (emphasis in the original). The jury obviously believed the damages caused by Dr. McCurdy's negligence were wholly separate from Ditto's injuries resulting from Dr. McCurdy's fraudulent conduct. Moreover, as previously discussed, the evidence of Dr. McCurdy's gross negligence was so overwhelming that any additional discussion on plain negligence is unnecessary. We therefore affirm, without further comment, the jury's finding of negligence.

### 3. *The jury's calculation of punitive damages*

 We are unable, however, to conclude from the record that the erroneous jury instructions did not prejudicially influence the jury in its calculation of punitive damages. The court gave the jury separate instructions on fraud and punitive damages, and the jury found Dr. McCurdy separately liable for each. Nevertheless, the jury gave only one award for punitive damages, and it is possible that the jury based part of its award on evidence of Dr. McCurdy's fraud.

In fact, Ditto's counsel expressly told the jury that, in determining the amount to award for punitive damages, it should take into account, *inter alia*, a doctor's failure to discuss with a patient his or her qualifications. Specifically, Ditto's counsel argued in closing:

> And there is a fourth issue. The last little piece. Punitive damages. The judge is going to instruct you that you may award damages in this case that are intended to punish Dr. McCurdy for what he has done, and you may award them to deter others from engaging in similar conduct, if you choose. I don't know what the proper figure should be in the punitive damages box. But in deciding that, think about the other people in this community. *Think about the unsuspecting women, girls, mature adults, who end up going to see doctors who don't tell them all they ought to have told them about hair [sic] credentials,* about surgery, about what they are getting into. That should help you.

(Emphasis added.)

Because the special verdict form did not specifically delineate punitive damages for fraud, gross negligence, and willful misconduct, it is impossible to apportion the punitive damages award. Nor can we let the award stand for gross negligence or willful misconduct, given counsel's argument before the jury and the evidence of fraud presented at trial that may have inflated the punitive damages award.

Accordingly, we vacate the jury's $600,000 award of punitive damages.

### III. *CONCLUSION*

For the foregoing reasons, we: (1) reverse the jury's finding of liability with respect to fraud; (2) vacate the jury's award of punitive damages; and (3) remand with instructions to the trial court to dismiss the fraud count and conduct a new trial solely on the issue of the amount of punitive damages owed.