14 P.3d 1049

**Linda B. SHOPPE, Plaintiff–Appellant,**

v.

**GUCCI AMERICA, INC., a New York corporation, and Sharleen Perreira, Defendants–Appellees.**

No. 21602.

Supreme Court of Hawai'i.

Dec. 28, 2000.

Lawrence W. Cohn, on the briefs, for plaintiff-appellant.

Andrew V. Beaman, (Trudy Burns Stone with him on the brief) of Chun, Kerr, Dodd, Beaman & Wong, for defendants-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by RAMIL, J.

In this wrongful termination case, plaintiff-appellant Linda B. Shoppe (Plaintiff) appeals the circuit court's judgment, findings of fact, conclusions of law, and order granting defendants-appellees Gucci America, Inc. (Gucci) and Sharleen Perreira's (collectively, Defendants) motion for summary judgment. On appeal, Plaintiff contends that the circuit court erred in granting summary judgment in favor of Defendants because: (1) she was the victim of age discrimination; (2) Defendants breached an implied employment contract; (3) Defendants fraudulently hired and fired her; and (4) there is significant evidence of intentional infliction of emotional distress caused by Defendants. For the reasons discussed below, we affirm the judgment and order of the circuit court.

## I. BACKGROUND

Gucci is a New York corporation authorized to do business in the State of Hawai'i. Gucci employs Sharleen Perreira as its district manager. As Gucci's district manager for Hawai'i, Perreira has the primary responsibility for the interviewing, hiring, and firing of all store managers and assistant managers of Gucci's Hawai'i stores. In addition, Perreira directly manages Gucci's local warehouse and its Ala Moana store, serves as a principal buyer for its local inventory, and oversees operations of Gucci's Hawai'i stores.

In 1995, Gucci planned to open a new store on the island of Maui. In attempting to hire a manager for the new store, Perreira advertised for the position of store manager in local newspapers during the summer of 1995. In August 1995, Perreira retained Millman Search Group, Inc., an executive search firm whose president is Mark Millman, to find management candidates for Perreira to interview.

Millman contacted several prospective candidates for the Maui store, including Rae Seki—a woman in her mid-thirties. Seki had several years of experience in management of "high-end" fashion stores in Hawai'i and indicated that she was interested in the job, but would not be able to commence employment until 1996 because of her pregnancy. Millman did not identify Seki as a candidate for the position to Perreira or Gucci. In addition, Millman sent a list of eleven prospective candidates to Perreira to interview, which did not include Seki's name. Seki testified in her deposition that she did not hear anything more from Gucci until after the store opened. Perreira testified that she did not know who Seki was until after the store opened.

On September 29, 1995, after learning "by word of mouth" that Gucci was looking for a manager for its Maui store, Plaintiff sent a cover letter and resume expressing her interest in the position. At that time, Perreira was forty-two years old and Plaintiff was forty-six years old. Plaintiff had experience as a store manager for Crazy Shirts and Sharper Image but had no "high-end" fashion retail experience.

Plaintiff thereafter spoke to "a very close friend," former Gucci buyer Margaret Hanley, about the position. Hanley then called Karen Lombardo, Gucci's Vice President of Human Resources, and recommended Plaintiff. In turn, Lombardo relayed the recommendation to Perreira. According to Perreira, Hanley's recommendation "weighed heavily," even though she had some concern about Plaintiff's lack of "high-end" fashion retail experience. Perreira felt that Plaintiff "would understand how to run a store."

Sometime during the week of October 16, 1995, Perreira interviewed Plaintiff. Plaintiff's age was not discussed during the interview and, according to Perreira, was not a factor in Perreira's decision to hire Plaintiff. After Perreira offered Plaintiff the position, Perreira confirmed by letter to Plaintiff that "your employment is now scheduled to commence November 27."

On November 11, 1995, Plaintiff completed and signed Gucci's employment application, which stated in relevant part: "This is an application for employment with Gucci Amer-

ica, Inc. which may be terminated without cause or notice by the employer or employee." The last page of the employment application, which Plaintiff signed, stated: "In consideration of my employment, I agree that ... [m]y employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either Gucci or myself."

Plaintiff also received a Gucci Employee Handbook, the last page of which contains a "Statement of Awareness," again acknowledging that her employment with Gucci would be "at will." In her deposition, Plaintiff acknowledged that she understood that her employment with Gucci was "at will." The Gucci employee handbook also states: "Gucci does not discriminate in the terms or conditions of employment because of age...."

On December 8, 1995, Gucci opened its boutique in Whaler's Village on Maui. Plaintiff reported directly to Perreira. Perreira quickly became unhappy with Plaintiff's job performance. Over the course of the next five and one-half months of Plaintiff's employment with Gucci, Perreira repeatedly reprimanded Plaintiff, primarily by telephone. Perreira testified in her deposition that Plaintiff was "often late to work, late with her morning sales reports, slipshod in her internal reporting, careless about monitoring important dates, unprofessional in her personal appearance, difficult to train, and unable to take directions[.]"

On one occasion, Perreira sent an inventory instruction packet to Plaintiff. The packet contained documents that needed to be completed and returned to Honolulu in order for needed inventory to be shipped. Perreira testified that she visited the Whaler's Village store and found these documents lying on the floor. Plaintiff missed the deadline to return the documents to Honolulu.[1]

In addition, Perreira testified that Plaintiff failed to prepare complete and detailed operating reports for her store. Although Plaintiff maintained that her report was accurate and that it was the one and only operating report that she prepared, Plaintiff acknowledged that her operating report was not nearly as detailed as those of Gucci's other Hawai'i stores.

With respect to Plaintiff's tardiness, Perreira testified that Plaintiff was often tardy for work even after repeated warnings by Perreira that Plaintiff needed to arrive at the store no later than 8:00 a.m. every day so that she could "fax over a copy of her daily sales to the warehouse every morning ... [at] eight a.m." A copy of the store's daily sales was required so that inventory could be replaced. If Plaintiff failed to send the report by 8:00 a.m., delivery of replacement inventory could be delayed. Plaintiff admitted that her reports were late "many times" and that she did not appear for work until 8:30 a.m. on weekends.

With respect to the dress code, Plaintiff found it difficult to comply with Gucci's standards. Gucci's employee handbook provides:

Gucci has an image of fashion and taste. As an employee you are part of that image. Your appearance is as vital to the name of "Gucci" as is the quality and distinction of our merchandise.

It is important for you to present a neat, attractive personal appearance, especially if you work on the selling floor.

To help you do this, uniforms are provided for all of our sales personnel. To complete the *Gucci Look* women are required to wear neutral colored nylons and black shoes. Tailored jewelry may compliment your outfit if so desired. Makeup and hairstyle should compliment attire.

On numerous occasions, Perreira reprimanded Plaintiff for her failure to follow Gucci's standards of dress and grooming.

During Plaintiff's employment, Perreira told Plaintiff that Gucci was "aiming for a younger look" in its merchandising. In her deposition, Plaintiff recalled the statement in the following context:

[Gucci's Counsel]: In your application for, your initial papers that you filed with

---

1. In her deposition, Plaintiff maintained that she was waiting for an inventory control person to arrive from Honolulu. However, Plaintiff did not deny that she failed to follow Perreira's written instructions to her and missed the deadline.

the Civil Rights Commission you said that Sharleen told you the younger look statement was made in context of merchandising?

[Plaintiff]: Right. Initially, yes.

[Gucci's Counsel]: And I am unclear what the problem with that statement, "a younger look", in the context of merchandising. I'm unclear as—

[Plaintiff]:—that's that—

. . . .

[Gucci's Counsel]: I'm unclear about what you have a problem with about that statement. Can you explain to me, please?

. . . .

[Plaintiff]: The merchandising part she very, she was sitting down and going over her buy to Milan. This was maybe January or February, I can't remember that specifically.

And she looked straight at me and said,

"As you can see by the merchandise we're producing we are looking for a much younger look in the company."

[Gucci's Counsel]: Merchandising is a term used in retail stores with which I'm not entirely familiar. Can you explain that term to me, please?

[Plaintiff]: The look, the merchandise. You know, this type of handbag. . . . Which is referred to as the hobo bag, which as she stated and—

[Gucci's Counsel]:—"she" being [Perreira]?

[Plaintiff]: "She" being [Perreira]. That they were aiming toward the early 30s type, what was known as the Olies, the office ladies of Japan. No longer the older, middle-aged couples.

[Gucci's Counsel]: No longer or in addition to?

[Plaintiff]: In addition to, but they were, let's just say they were focusing on that age group much more aggressively.

[Gucci's Counsel]: So prior to this time is it your understanding that Gucci had a market segment which was addressed to wealthier, more mature women?

[Plaintiff]: Correct.

[Gucci's Counsel]: And is it your understanding that at this time Gucci had decided to also add a market segment of younger women?

[Plaintiff]: I think focus on would be more accurate.

[Gucci's Counsel]: Focus on and add to its other existing customer base?

[Plaintiff]: Oh, correct. That's fair.

[Gucci's Counsel]: What would be the business reason for their doing so in your opinion?

[Plaintiff]: To make more money, of course.

In January 1996, the Hawai'i district manager for Chanel told Perreira of Rae Seki, who she thought might be available to manage Gucci's Maui store. Unlike Plaintiff, Seki had extensive experience in the fashion industry. Seki described her prior experiences as being district manager for Alexia Fashions and a store manager for The Gap on Maui. Perreira and Gucci's director of stores, Bob Ferraro, had several interviews with Seki between March and May 1996.

Although Gucci's employee handbook stated that an employee is not eligible for vacation until the second year of employment, on March 11, 1996, Plaintiff sent a written request to Ferraro for permission to take a week's vacation following the meeting of all Gucci store managers in New York. Having known that Perreira was unhappy with Plaintiff's performance, Ferraro sent Perreira the following note upon receipt of Plaintiff's request:

It is a huge waste of money and time invested in [Plaintiff] to bring her into the meetings if you are planning on terminating her. I realize that we are only a month away from the meetings but we are also running beyond the probationary period which means it may become more difficult to let her go. Please check with [Lomabardo] on this. I'm not going to respond to this [request from Plaintiff]— it's your call.

Ultimately, Perreira recommended to Ferraro and Lombardo that Plaintiff's employment should be terminated based on Plaintiff's insufficient improvement and poor

performance despite being verbally counseled. Perreira also recommended that Gucci should hire Seki to replace her. Ferraro and Lombardo agreed. Although Perreira testified that she could not recall the exact date on which the actual decision to terminate Plaintiff was made, Perreira terminated Plaintiff on May 6, 1996.

On January 21, 1997, Plaintiff filed a complaint against Gucci and Perreira, alleging that she was wrongfully terminated. Specifically, Plaintiff stated claims for: (1) age discrimination, in violation of HRS § 378–2 (Supp.1999); (2) breach of employment contract; (3) fraud; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress. Plaintiff also asserted that Gucci committed a "violation of public policy."

On February 18, 1998, Defendants filed a motion for summary judgment. The circuit court set a hearing on the motion for March 25, 1998, at 8:30 a.m. Despite proper service of the motion and the notice of hearing on the motion, Plaintiff's attorney failed to appear at the hearing on Defendants' motion for summary judgment when the clerk of the court called the case. After a clerk called for Plaintiff's attorney in the hallway of the courthouse, the circuit court went forward with the hearing on the motion. At 9:00 a.m., the circuit court noted for the record that Plaintiff's attorney was still not present. At the conclusion of the hearing, the circuit court granted Defendants' motion for summary judgment. On May 5, 1998, the circuit court entered final judgment as to all claims and all parties. Thereafter, Plaintiff filed a timely notice of appeal.

## II. STANDARD OF REVIEW

■ We review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 104, 839 P.2d 10, 22, reconsideration denied, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Id. (citations and internal quotation marks omitted); see Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Hulsman v. Hemmeter Dev. Corp., 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

Konno v. County of Hawai'i, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting Dunlea v. Dappen, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). In addition,

"[t]he evidence must be viewed in the light most favorable to the non-moving party." State ex rel. Bronster v. Yoshina, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing Maguire v. Hilton Hotels Corp., 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." Maguire, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

State Farm Mut. Auto Ins. Co. v. Murata, 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting Estate of Doe v. Paul Revere Ins. Group, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997)) (some brackets in original and some added).

TSA Int'l, Ltd. v. Shimizu, 92 Hawai'i 243, 251–53, 990 P.2d 713, 721–23 (1999).

## III. DISCUSSION

A. Proceedings on Defendant's Motion for Summary Judgment in the Absence of Plaintiff's Counsel

■ Plaintiff complains that the circuit court improperly denied her oral argument by proceeding with the hearing on Defen-

dants' motion for summary judgment in the absence of Plaintiff's counsel. Rule 8 of the Rules of the Circuit Courts (1997) authorizes the circuit court to "order any matter submitted on the briefs and/or affidavits, without oral argument." *See Wilder v. Tanouye*, 7 Haw.App. 247, 252, 753 P.2d 816, 820 (1988). Further, Rule 7 of the Rules of the Circuit Courts (1997) provides in relevant part: "Failure to appear at the hearing may be deemed a waiver of objections to the granting of the motion." We hold that the circuit court properly proceeded with the hearing when the case was called as scheduled in accordance with the notice of hearing that was sent to all the parties.

### B. *Age Discrimination*

Plaintiff contends that the circuit court erred in granting summary judgment on her claim for age discrimination. Because there is undisputed evidence that Plaintiff failed to perform her job duties in a satisfactory manner, we disagree.

HRS § 378–2(1)(A) (Supp.1999) provides in relevant part:

It shall be an unlawful discriminatory practice:

(1) Because of race, sex, sexual orientation, *age*, religion, color, ancestry, disability, marital status, or arrest and court record:

(A) For any employer to refuse to hire or employ or to bar or *discharge from employment*, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

(Emphases added.) Based upon this language, Hawaii's Employment Discrimination Law prohibits employers from discharging an individual because of his or her age.

■ The interpretation of Hawaii's Employment Discrimination Law with respect to age discrimination presents an issue of first impression in this jurisdiction. In interpreting HRS § 378–2 in the context of race and gender discrimination, we have previously looked to the interpretations of analogous federal laws by the federal courts for guidance. *Furukawa v. Honolulu Zoological Soc'y*, 85 Hawai'i 7, 13, 936 P.2d 643, 649 (1997) ("The federal courts have considerable experience in analyzing these cases, and we look to their decisions for guidance."); *see also Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 279 n. 10, 971 P.2d 1104, 1114 n. 10 (1999) (citation omitted). We have also recognized, however, that federal employment discrimination authority is not necessarily persuasive, particularly where a state's statutory provision differs in relevant detail. *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 (citations omitted).

#### 1. *Theories of Employment Discrimination Based on Age*

The Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. §§ 621–34 (1995 & Supp.1997), prohibits employment discrimination on the basis of age. The ADEA provides anti-discrimination protections for employees aged forty and over. *Id.*

■ Generally, an individual alleging employment discrimination under the ADEA may pursue one or more of three available theories of discrimination: (1) intentional discrimination against a protected class to which the plaintiff belongs (also known as "pattern-or-practice" discrimination);[2] (2) unintentional discrimination based on a neutral employment policy that has a disparate impact on a protected class to which the plaintiff belongs (also known as "disparate impact" discrimination);[3] or (3) intentional discrimi-

**2.** Under the pattern-or-practice paradigm, a plaintiff must prove, by circumstantial or direct evidence, that an employer's past actions evidence a pattern of illegal discrimination against a protected class. *See, e.g., Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Cooper v. Federal Reserve Bank*, 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (citing *International Bhd.*

*of Teamsters v. United States*, 431 U.S. 324, 326, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

**3.** Under the disparate impact paradigm, a plaintiff must prove statistically that a certain employment practice has a disparate impact on a protected class. *See, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (using statistics to demonstrate that an

nation against an individual who belongs to a protected class (also known as individual "disparate treatment" discrimination).[4] In this case, Plaintiff asserts that Defendant intentionally discriminated against her because of her age (*i.e.*, that she was subjected to "disparate treatment").

■■■■ A plaintiff can prove disparate treatment in two ways. First, under the "direct evidence" or "mixed motive" approach, the plaintiff must show by direct evidence that discriminatory factors motivated the adverse employment decision. *See, e.g., Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir.1992) (stating that "what is required (for mixed-motive analysis) is simply that the plaintiff submit enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were 'because of' an impermissible factor"); *Caban–Wheeler v. Elsea*, 71 F.3d 837, 842–43 (11th Cir.1996) (involving black decisionmaker who told white employee that decisionmaker wanted black person to have white employee's job). If the plaintiff can make this showing, the burden shifts to the employer to prove that it would have taken the same adverse employment action against plaintiff absent the discrimination. *See Eskra v. Provident Life & Accident Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir.1997).

Second, a plaintiff may attempt to prove individual disparate treatment by adducing circumstantial evidence of discrimination. When analyzing an individual's disparate treatment claim that relies on circumstantial evidence of employer discrimination, we have previously applied the burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Teague*, 89 Hawai'i at 279 n. 10,

971 P.2d at 1114 n. 10 (citing *Furukawa*, 85 Hawai'i at 12, 936 P.2d at 648).

2. *The Analytical Framework in Circumstantial Discrimination Cases*

■■■■ The *McDonnell Douglas* framework involves three steps. First, the plaintiff must establish a prima facie case of discrimination by demonstrating, by a preponderance of evidence, the following four elements: (1) that plaintiff is a member of a protected class; (2) that plaintiff is qualified for the position for which plaintiff has applied or from which plaintiff has been discharged; (3) that plaintiff has suffered some adverse employment action, such as a discharge; and (4) that the position still exists. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (reaffirming elements of the prima facie case as set forth in *McDonnell Douglas* ); *see also Teague*, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10 (citing *Furukawa*, 85 Hawai'i at 12, 936 P.2d at 648). Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817; *see also Teague*, 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10 (citing *Furukawa*, 85 Hawai'i at 12, 936 P.2d at 648). The employer's explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089. Although the burden of production is shifted to the employer, "(t)he ultimate burden of

---

employer's general intelligence test operated to discriminate against African Americans); *see also Latinos Unidos De Chelsea En Accion (LUCHA) v. Secretary of Hous. & Urban Dev.*, 799 F.2d 774, 784 (1st Cir.1986) ("statistical disparity may be sufficient to establish a prima facie case of employment discrimination"). The focus of disparate impact discrimination claims is not on individual hiring and firing decisions, but rather on the impact that policies and procedures have on

a certain class of individuals. *See Griggs*, 401 U.S. at 432, 91 S.Ct. 849.

**4.** *See International Bhd. of Teamsters*, 431 U.S. at 335–36 n. 15, 97 S.Ct. 1843 (describing disparate treatment discrimination as "the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.").

persuading the trier of fact that the employer intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253 (citing *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)).

 Finally, if the employer rebuts the prima facie case, the burden reverts to the plaintiff to demonstrate that the defendant's proffered reasons were "pretextual." *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089; *Harrison v. Metropolitan Gov't of Nashville & Davidson County,* 80 F.3d 1107 (6th Cir.1996) (African American officer showed that the reasons given by the employer were pretextual by adducing evidence that a white officer was not terminated for comparable reasons), *cert. denied,* 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996); *see also Teague,* 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10 (citing *Furukawa,* 85 Hawai'i at 12, 936 P.2d at 648). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089 (citing *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817). If the plaintiff establishes that defendant's proffered reasons were pretextual, the trier of fact may, but is not required to, find for the plaintiff. At all times, the burden of persuasion remains on the plaintiff. *Teague,* 89 Hawai'i at 279 n. 10, 971 P.2d at 1114 n. 10 (citing *Furukawa,* 85 Hawai'i at 12–13, 936 P.2d at 648–49).

### 3. *The "Same Actor Inference"*

In attempting to establish pretext in the final step of the *McDonnell Douglas* framework, many federal circuit courts of appeal have required plaintiffs to overcome the "same actor inference." *See, e.g., LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 847 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 463 (6th Cir.1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996);

*Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1147 (7th Cir.1994); *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992); *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996). "[W]here the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley,* 104 F.3d at 270–71. In *Proud v. Stone,* 945 F.2d 796 (4th Cir.1991), the United States Court of Appeals for the Fourth Circuit became the first court to recognize the same actor inference defense. *Id.* at 797. In adopting the inference, the Fourth Circuit concluded that a strong supposition exists that discrimination could not have been a determining factor for adverse employment action taken by the employer in cases where an employee is terminated by the hiring individual within a relatively short time after being hired. *Id.* The plaintiff in *Proud* was hired on the basis of a written application sent to a United States Army Division in Germany. *Id.* at 796. The hiring official selected Proud over six younger applicants for the position of chief accountant. Proud's date of birth, indicating that he was sixty-nine years old, was noted on his employment application. When Proud arrived in Germany, he agreed to assume temporarily the responsibilities of an accounting technician who had recently resigned. *Id.* The hiring official's stated reason for terminating Proud related largely to dissatisfaction with Proud's performance of the accounting technician duties. *Id.* at 797.

At trial, the United States District Court for the Eastern District of Virginia granted the Army's motion for dismissal at the close of the plaintiff's case. *Id.* The district court found that Proud had failed to present a prima facie case of discriminatory termination under the *McDonnell Douglas* analysis because his performance at the time of discharge did not meet the employer's legitimate expectations. In addition, the district court found no evidence of discrimination, noting, among other evidence, that Proud's age was the same at hiring and firing. *Id.*

On appeal, the Fourth Circuit agreed that the hirer-firer relationship was significant.

In affirming the district court, the Fourth Circuit reasoned:

> One is quickly drawn to the realization that "[c]laims that employer animus exists in termination but not in hiring seem irrational." From the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."

*Id.* (citing John J. Donohue III & Peter Siegelman, *The Changing Nature of Employment Discrimination Litigation,* 43 Stan. L .Rev. 983, 1017 (1991)). Based upon this

5. In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the United States Supreme Court recently held that a plaintiff's prima facie case of employment discrimination, as defined in *McDonnell Douglas,* combined with sufficient evidence for the trier of fact to disbelieve the employer's proffered nondiscriminatory explanation, *may* permit the trier of fact to conclude that the employer intentionally discriminated. *Id.* at 2109 (emphasis added). The plaintiff need not always adduce additional evidence other than that used to rebut the employer's explanation. *Id.* at 2108–09. The Court further stated, however, that:

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for summary judgment as a matter of law.

*Id.* The same-actor inference was not at issue in *Reeves,* but it would appear to qualify as "other evidence that supports the employer's case and that properly may be considered on a motion for summary judgment as a matter of law." *Id.*

6. Since the Fourth Circuit's 1991 decision in *Proud,* subsequent adaptations of the same actor doctrine have expanded upon the doctrine's original parameters as set forth in *Proud.* First, although *Proud* involved an age discrimination case, subsequent cases adapting the same actor doctrine have applied the doctrine in cases involving the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12201–12213 (1994), which prohibits discrimination on the basis of disability, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1994), which prohibits discrimination by covered employers on the basis of race, color, religion, gender or national origin. *See Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209 (4th Cir.1994) (extending *Proud* inference to ADA context, strengthening terminology to "strong presumption"); *Mitchell*

principle, the Fourth Circuit held that "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id.* The court noted that the hirer-firer inference would be appropriate at the pretext stage of the *McDonnell Douglas* framework.[5] *Id.* at 798.

Although we adopt the reasoning of the Fourth Circuit in *Proud,* we decline to extend the parameters of the same actor inference beyond that applied in *Proud.*[6]

*v. Data Gen. Corp.,* 12 F.3d 1310 (4th Cir.1993) (extending *Proud* inference to reduction-in-force situation and affirming summary judgment for employer); *Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126 (4th Cir.1995) (national origin); *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 464 (6th Cir.1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996) (gender); *Jiminez v. Mary Washington College,* 57 F.3d 369, 378 (4th Cir.1995) (race and national origin).

Second, although the same actor doctrine was originally restricted to situations in which the same person did the hiring and firing, the requirement of a direct relationship among the hirer, the firer, and the employee has been significantly loosened. In many cases, the doctrine has been applied even where there have been multiple decisionmakers or when there has been ambiguity as to whether the same individual was involved in both actions. *See, e.g., Amirmokri,* 60 F.3d at 1130 (indicating that hirer-firer identity satisfied if the same company involved in both decisions); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 513 (4th Cir.1994) (suggesting that a direct relationship between the individual hirer and the plaintiff is not necessary to establish the inference so long as the firing official has hired others in the plaintiff's protected class); *Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 (5th Cir.1997) (implicitly rejecting employee's contention disputing the identity of the hirer and firer and accepting employer's argument that corporate decisions are often made by management groups); *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173, 174 (8th Cir.1992) (considering evidence that "same people" or "same company officials" hired and fired plaintiff in less than two years "compelling ... in light of the weakness of the plaintiff's evidence otherwise"); *but see Madel v. FCI Mktg., Inc.,* 116 F.3d 1247, 1253 (8th Cir.1997) (declining to infer nondiscrimination when derogatory comments made by plaintiff's supervisor could have influenced employer's decision to fire plaintiff).

Third, the same actor inference has been raised in failure-to-promote and failure-to-hire

Theoretically, the hirer-firer relationship could be invoked to discredit a plaintiff's discrimination claims in virtually every hire-fire situation. We therefore hold that the same actor inference is merely a permissive inference supplemental to other evidentiary or policy considerations.

### 4. Plaintiff's Claims and the Undisputed Evidence

Plaintiff appears to assert that there is direct evidence of age discrimination because she was "singled out" for criticism of her grooming, and that such criticism, taken together with Perreira's comment that Gucci was "aiming for a younger look," amounts to direct evidence of age discrimination. Alternatively, Plaintiff maintains that she has adduced indirect evidence from which a trier of fact could reasonably infer that such discrimination had occurred and that Gucci's asserted reasons for terminating her were pretextual. As discussed above, a defendant in an age discrimination case will prevail if the defendant can articulate a legitimate, nondiscriminatory reason for the adverse employment action.

■ In this case, there is undisputed evidence that Plaintiff was not performing her job in a satisfactory manner. During the five and one-half months that Plaintiff worked for Gucci, Plaintiff was repeatedly tardy in reporting to work and faxing her

inventory report to the warehouse. Plaintiff does not dispute that each store manager was required to fax their merchandise replacement needs to the Gucci warehouse on O'ahu no later than 8:00 a.m. each morning. The merchandise for the Maui store could then be shipped by plane from O'ahu on the same day. Plaintiff admitted that she failed to arrive at work early enough to meet the 8:00 a.m. deadline. Moreover, Plaintiff acknowledged that she often arrived at the store after 8:00 a.m. Although Plaintiff was reprimanded on numerous occasions for her tardiness, Plaintiff continued to arrive at the store later than 8:00 a.m. In addition, as noted above, Plaintiff failed to meet internal sales reporting deadlines, failed to follow Perreira's specific instructions, prepared documents that were not sufficiently detailed, and failed to adhere to Gucci's dress code.

Under these circumstances, there does not appear to be a genuine issue of fact regarding Plaintiff's failure to perform the duties of store manager satisfactorily. Therefore, Defendants have articulated legitimate, nondiscriminatory reasons for the adverse employment action against Plaintiff.

■ Plaintiff contends that Defendants' asserted reason for her termination, the alleged failure to satisfactorily perform her duties, was pretextual. Specifically, Plaintiff asserts that "the uncontradicted evidence is

---

situations. See, e.g., Hartsel v. Keys, 87 F.3d 795 (6th Cir.1996), cert. denied, [519 U.S. 1055,] 117 S.Ct. 683, [136 L.Ed.2d 608].(1997); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954 (4th Cir.1996); Amirmokri, 60 F.3d at 1130; Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160 (6th Cir.), amended by 97 F.3d 833 (6th Cir.1996).

· Fourth, although the time interval between the hiring and firing decisions was originally required to be "relatively short," or "several months," Proud, 945 F.2d at 796–97 (four months), subsequent cases have extended the time interval to up to seven years. See Buhrmaster, 61 F.3d at 462–64. See also, e.g., Grossmann v. Dillard Dep't Stores, Inc., 109 F.3d 457 (8th Cir.1997) (four years); Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir.1996) (four-plus years).

Fifth, although the same actor doctrine was originally termed a "strong inference," Proud, 945 F.2d at 798, subsequent cases have termed the inference a "powerful inference," "presumption," and "strong presumption." See Bradley, 104 F.3d at 270–71 (strong inference); Mitchell,

12 F.3d at 1318 (strong inference); Evans, 80 F.3d at 959 (powerful inference); Brown, 82 F.3d at 658 (presumption); Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 215 (4th Cir.1994). Although the words "inference" and "presumption" often are used interchangeably, the two words may have distinct implications in a given case. See, e.g., Anna Laurie Bryant & Richard A. Bales, Using the Same Actor "Inference" in Employment Discrimination Cases, 1999 Utah L.Rev. 255, 281 (1999). "An inference is a logical conclusion that a fact finder is permitted, but not required, to make based on circumstantial evidence. The fact finder may draw the inference or not, as its experience and the other evidence may move it." Id. (citing See Joel S. Hjelmaas, Stepping Back from the Thicket: A Proposal for the Treatment of Rebuttable Presumptions and Inferences, 42 Drake L.Rev. 427, 431 (1993), and Jerome A. Hoffman, Thinking About Presumptions: The "Presumption" of Agency from Ownership as Study Specimen, 48 Ala.L.Rev. 885, 892 (1997)).

382

that she never received a written citation from Perreira (or anyone else) for any of [the] alleged [misconduct] nor does her Employee Separation form reflect any of those things as a reason for her termination...."

Despite Plaintiff's assertions, however, the fact that Plaintiff did not receive a written reprimand or that her separation form did not indicate the specific reasons for which she was terminated does not reasonably yield an inference that Defendants' reasons for terminating Plaintiff were pretextual. Although Plaintiff did not receive a written reprimand, it is uncontroverted that Plaintiff received numerous oral reprimands regarding numerous issues related to her performance. In any event, we cannot see how the mere absence of a written reprimand or the fact that Plaintiff's separation form does not indicate the precise reason for Plaintiff's termination could, in of themselves, reasonably create a genuine issue of material fact such as to defeat summary judgment.

█ Although Plaintiff insists that the expert opinions of her economist, Thomas A. Loudat, Ph.D., "adds more evidence of discrimination," we fail to see how such evidence would create an issue of fact that Defendants' proffered reasons for terminating Plaintiff were pretextual. Dr. Loudat's testimony in an affidavit attached to Plaintiff's motion in opposition to Gucci's motion for summary judgment merely states that: (1) there is a disproportionately larger number of younger individuals hired by Gucci or working as managers than in the United States' labor force in general; (2) on average, Gucci managers/assistant managers have a statistically significantly younger age relative to the labor force; and (3) Plaintiff was the oldest manager or assistant manager ever hired by Gucci in Hawai'i and the third oldest nationwide. Even taking Loudat's testimony to be true, Loudat's conclusions do not reasonably lead to an inference that Defendant's reasons for discharging Plaintiff were pretextual. The fact that Plaintiff, despite her age, was hired and fired by Perreira to begin with, casts doubt upon Plaintiff's theory that Defendants' reasons for termination were pretextual. In addition, Loudat's report does not indicate the average age of workers

in the fashion industry and whether the average age of Gucci's workers is above or below the average age of workers in the fashion industry. Therefore, Loudat's report does not create a genuine issue of material fact with respect to whether Defendants' asserted reasons for termination were pretextual.

Moreover, as discussed above, Perreira both hired and fired Plaintiff. Perreira hired Plaintiff because she believed that Plaintiff would be able to manage the store even without experience in the high-end fashion industry. After five and one-half months and repeated reprimands, however, Perreira concluded that Plaintiff would not be able to satisfactorily perform the duties required by the position. Although the fact that Perreira was the same actor is not conclusive for purposes of determining pretext, we are nonetheless left with the inference that Defendants' proffered reasons for terminating Plaintiff were not pretextual.

Under these circumstances, we hold that Plaintiff has not met her burden of establishing that Defendants' articulated reason for taking adverse employment action against her was pretextual. Plaintiff has not alerted this court to any other evidence that would give rise to a genuine issue of material fact in this regard. Therefore, inasmuch as there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law, the circuit court correctly granted summary judgment.

## C. Employment Contract

Plaintiff next argues that Gucci's employee handbook constituted an "implied contract" that: (1) bound Gucci to give two written warnings before termination; and (2) because she had no written warnings, Gucci breached its implied contract. Plaintiff's argument is without merit.

### 1. The "At Will" Employment Doctrine

█ In the mid-nineteenth century, "[e]merging notions of the freedom of contract and of the value of economic growth contributed to the evolution of the at-will doctrine," which recognizes an employer's right to discharge "for good cause, for no

cause or even for cause morally wrong[.]" *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 374–75, 652 P.2d 625, 628 (1982). The "at-will doctrine" became known as the "American rule" and has long governed terminations of the employer-employee relationship. *Id.* at 375, 652 P.2d at 628 (citing *Greer v. Arlington Mills Mfg. Co.*, 43 A. 609 (Del.Super.Ct.1899); *McCullough Iron Co. v. Carpenter*, 67 Md. 554, 11 A. 176 (1887); *Martin v. New York Life Ins. Co.*, 148 N.Y. 117, 42 N.E. 416 (1895)).

> By the beginning of the twentieth century, the employer's right to discharge "for good cause, for no cause or even for cause morally wrong" was absolute. In recent years, however, Congress and the legislatures of many states have enacted legislation to protect employees from the whims of employers. *Nevertheless, absent a collective bargaining agreement, a contractual provision, or a statutorily-conferred right which reduces the likelihood of abusive or wrongful discharge, the at-will doctrine prevails.*

*Parnar*, 65 Haw. at 375, 652 P.2d at 628 (footnote omitted) (emphasis added).

 The principle that the at-will doctrine prevails absent a collective bargaining agreement, a contractual provision, or a statutorily-conferred right has remained untouched in this jurisdiction since this court's decision in *Parnar*. *See, e.g., Best Place, Inc. v. Penn America Ins. Co.*, 82 Hawai'i 120, 124 n. 5, 920 P.2d 334, 357 n. 5 (1996); *Ross v. Stouffer Hotel Co.*, 76 Hawai'i 454, 463–64, 879 P.2d 1037, 1046–47 (1994); *Kinoshita v. Canadian Pacific Airlines, Ltd.*, 68 Haw. 594, 600, 724 P.2d 110, 115 (1986); *Smith v. New England Mut. Life Ins. Co.*, 72 Haw. 531, 553, 827 P.2d 635, 645 (1992); *Smith v. Chaney Brooks Realty*, 10 Haw. App. 250, 257–58, 865 P.2d 170, 173 (1994). We therefore reaffirm the general principle that, in the absence of a written employment agreement, a collective bargaining agreement, or a statutorily-conferred right, employment is at-will. Such at-will employment is, "by definition, ... terminable at the will of either party, for any reason or no reason at all." *Best Place*, 82 Hawai'i at 124, 920 P.2d at 357 (1996). As such, parties to an at-will employment contract enter into the contract with full knowledge that the employment is for. an indefinite duration and can terminate at the will of either party. *Id.* Correlatively, an employment contract of indefinite duration will generally be construed as giving rise to an at-will employment relationship and as therefore terminable at the will of either party for any reason or no reason. *Parnar*, 65 Haw. at 374, 652 P.2d at 627 (citing 9 S. Williston, Contracts § 1017 (3d ed.1967); Annot., 51 A.L.R.2d 742 (1957)); *see also Vlasaty v. Pacific Club*, 4 Haw.App. 556, 564, 670 P.2d 827, 833 (1983).

### 2. Limits of the "At Will" Employment Doctrine

 Despite our reaffirmation of the at-will principle, we recognize that courts have decided that the previously unfettered right of employers to discharge employees "can be contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees." *Kinoshita*, 68 Haw. at 601, 724 P.2d at 115–16 (citing *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1087 (1984) (citations omitted)). Indeed, "we joined the jurisdictions subjecting 'the employer's power of discharge to closer judicial scrutiny in appropriate circumstances' when we considered *Parnar*." *Parnar*, 65 Haw. at 377, 652 P.2d at 629.

In *Parnar*, this court recognized the public policy exception to the at-will employment doctrine. *Id.* at 380, 652 P.2d at 631. The plaintiff in *Parnar*, "whose contract [of employment] was of indefinite duration [and] hence terminable at the will of her employer[,] ... sue[d] for damages for an allegedly retaliatory discharge." *Id.* at 371, 652 P.2d at 626. Finding no genuine issue of material fact, the circuit court awarded the employer summary judgment. On appeal, the plaintiff argued that she "ha[d] a right to sue for a discharge in bad faith or in contravention of public policy," and that the presence of genuine issues of material fact rendered a summary disposition of her claims inappropriate. *Id.* at 373, 652 P.2d at 627.

Because this court was unwilling "to imply into each employment contract a duty to

terminate in good faith [and thereby] subject each discharge to judicial incursions into the amorphous concept of bad faith," we were "not persuaded that protection of employees require[d] such an intrusion [into] the employment relationship or such an imposition on the courts." *Id.* at 377, 652 P.2d at 629. Nevertheless, this court held that, where the "discharge of an employee violates a clear mandate of public policy[,]" his or her "employer [should] be . . . liable in tort." *Id.* at 380, 652 P.2d at 631. Accordingly, we vacated the judgment and remanded the case to afford the plaintiff an opportunity to prove her allegations that she was discharged to prevent her from giving evidence of the employer's illegal anti-competitive practices.

Subsequently, in *Kinoshita*, we discussed the applicability of other theories of contractual recovery for the wrongful discharge of an at-will employee by virtue of statements contained in employee policy manuals or handbooks issued by employers to their employees. *See Kinoshita*, 68 Haw. at 601–03, 724 P.2d at 115–117. We first discussed an approach that required the traditional components of contract formation (*i.e.*, offer, acceptance, and consideration) as necessary predicates to establish that statements and policies contained in an employment manual or handbook could give rise to contractual liability. *Id.* at 601, 724 P.2d at 116. However, we impliedly rejected this approach, noting that "[o]ther courts . . . have employed still another contractual theory to mitigate the severity of the doctrine when the circumstances are appropriate for relief."

In *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980), the Michigan Supreme Court reasoned, in determining whether statements made in an employee handbook gave rise to contractual liability, that

> the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the per-

sonnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation *"instinct with an obligation"*.

*Id.* at 892 (emphasis added) (footnotes omitted).

The plaintiff in *Toussaint* filed suit against his employer for wrongful discharge and testified that he was given a written manual containing the employer's personnel policies and procedures, including grounds for termination and procedures relating to discipline and termination, at the time of hire. When the plaintiff was terminated, however, he allegedly was not accorded the benefit of all of the procedures set forth in the manual. After the jury returned a verdict in Toussaint's favor, the employer appealed. The Michigan Court of Appeals reversed the judgment. The Michigan Supreme Court, however, reinstated the verdict, reasoning that

> employer statements of policy, such as the [employer's] Supervisory Manual and Guidelines, can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring.

*Id.* at 614–15, 292 N.W.2d at 892. *See also Thompson*, 685 P.2d at 1088 (holding that "if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship"); *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d 170 (1984) (noting that, "if an employer [chooses] to issue a policy statement,

in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it").

In *Kinoshita,* this court applied the principles and reasoning announced in *Toussaint,* emphasizing that the employer had "created a situation 'instinct with an obligation.'" 68 Haw. at 603, 724 P.2d at 117 (citations omitted). The employment policies in *Kinoshita* were promulgated with a cover letter stating that the policies constituted "an enforceable contract between us under [the] labour law of the state in which you work. Thus your rights in your employment arrangement are guaranteed." *Id.* at 598 n. 2, 724 P.2d at 114 n. 2. On appeal, this court reasoned that the employer was

> striving to create an atmosphere of job security and fair treatment, one where employees could expect the desired security and even-handed treatment without the intervention of a union, when it distributed copies of the rules to the employees who were to vote in a representation election. *It attempted to do so with promises of specific treatment in specific situations; it encouraged reliance thereon* [.]

*Id.* at 603, 724 P.2d at 117 (emphasis added). As a result, this court held that if an employer issues policy statements or rules, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it. *Id.*

### 3. *Gucci's Employee Handbook*

In contrast to *Kinoshita,* in which the employer made specific written guarantees of continued employment, Gucci's employee handbook clearly stated that Plaintiff's employment was at-will and could be terminated at any time with or without notice. The clear and unambiguous language of Gucci's employee handbook stated: "Your employment with Gucci is at will. This means that it may be terminated by you or by Gucci with or without cause and with or without notice." In addition, Plaintiff admitted that she was advised and aware at the time of hiring that she was an at-will employee. Plaintiff acknowledged and agreed in writing several times that her employment could be termi-

nated at any time, with or without notice, with or without warning, and with or without reason.

 Plaintiff argues that Gucci deviated from the termination procedures established in the employee handbook and that such a departure constituted a breach of an implied contract. Gucci's handbook stated in relevant part:

> On some occasions when your performance does not meet Gucci standards, you may be given a verbal warning by your supervisor or manager. Two or more such verbal warnings will result in a written Incident Report which will be discussed with you by your supervisor and become a permanent part of your employee file. The written Incident Report may also result without prior verbal warnings, if in the opinion of your supervisor or manager, your conduct warrants such action. *Serious discipline including suspension or termination, may result if: 1) in your supervisor's or manager's opinions such discipline is warranted* or, 2) you have received two or more written Incident Reports within a calendar year.

> *While your employment with Gucci may be terminated without cause by Gucci or by you,* the following represent some of the conduct which could result in serious disciplinary action up to and including termination: .... [e]xcessive absence or lateness and unexcused lateness or absence .... [and][b]elow standard job performance[.]

(Emphasis added.) Based upon this language, Gucci's employee handbook does not require a written warning before termination. The handbook provision makes it plain that termination is not predicated *exclusively* upon receipt of two or more written incident reports. An employee may be terminated without receiving a written report if, in the estimation her supervisor, "such discipline is warranted ."

Indeed, Perreira, Plaintiff's supervisor, determined that termination was appropriate for Plaintiff. As discussed, Plaintiff was admittedly tardy to work on many occasions and was tardy in faxing her inventory re-

ports to Gucci's warehouse. In addition, in Perreira's opinion, the quality of Plaintiff's operating reports for Gucci's Maui store and her dress and grooming standards fell below Gucci's standards. Plaintiff does not assert any other evidence that Defendants selectively applied the policies set forth in the employee handbook. In any event, Gucci cannot be said to have behaved in such a way as to induce reliance by Plaintiff. Under these circumstances, we cannot say that Gucci's employee handbook gave rise to the possibility of contractual recovery. Because Gucci's handbook did not modify its right to discharge employees, the circuit court correctly granted summary judgment in favor of Gucci.

## D. *Fraud*

Plaintiff next argues that the circuit court erred in granting summary judgment in favor of Defendants on the issue of fraud. In attempting to state a claim for fraud, Plaintiff alleged that Defendants had formed an intention, at the time they hired her, to hire Seki to replace Plaintiff as soon as Seki became available. Plaintiff's argument is without merit.

Rule 9(b) of the Hawai'i Rules of Civil Procedure (HRCP) (1997) provides in relevant part that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See Larsen v. Pacesetter Sys., Inc.*, 74 Haw. 1, 30, 837 P.2d 1273, 1288 (1992). This court has long recognized that a party claiming fraud must establish the following elements:

(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them.

*TSA Int'l, Ltd.*, 92 Hawai'i at 251, 990 P.2d at 725 (citing *Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (citing *Kang v. Harrington*, 59 Haw. 652, 656, 587 P.2d 285, 289 (1978)); *Larsen*, 74 Haw. at 30, 837 P.2d at 1288; *see also Pancakes of Hawaii, Inc. v. Pomare Properties Corp.*, 85 Hawai'i 300, 312, 944 P.2d 97, 109 (App.1997) (quoting *Honolulu*

*Fed. Sav. & Loan Ass'n v. Murphy*, 7 Haw. App. 196, 201–02, 753 P.2d 807, 811–12 (1988)). The party claiming fraud must establish these elements by clear and convincing evidence. *TSA Int'l, Ltd.*, 92 Hawai'i at 251, 990 P.2d at 725; *see also Dobison v. Bank of Hawaii*, 60 Haw. 225, 226, 587 P.2d 1234, 1235 (1978)).

We have further stated:

To be actionable, the alleged false representation must relate to a past or existing material fact and not the occurrence of a future event. *Stahl v. Balsara*, 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978) (emphasis added). As this court has previously observed:

> [F]raud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise.

*Id.* (citations omitted). Indeed, as this court has long stated:

> Fraud is never presumed. Where relief is sought on account of fraudulent representations, the facts sustaining the charge should be clearly and satisfactorily established.... Where misrepresentations are made to form the basis of relief, they must be shown to have been made with respect to a material fact which was actually false [.]

*Id.* at 148, 587 P.2d at 1213, (quoting *Peine v. Murphy*, 46 Haw. 233, 238, 377 P.2d 708, 712 (1962)) (citations omitted) (emphasis added).

*TSA Int'l, Ltd.*, 92 Hawai'i at 255–56, 990 P.2d at 725–26 (some emphases added and some omitted).

In this case, even taking all of Plaintiff's factual allegations as true, Plaintiff has failed to establish that Defendants made a false representation with respect to a material fact. Plaintiff maintains that she has presented "evidence of a *promise* of job securi-

ty." (Emphasis added.) Opening Brief at 32. As discussed above, however, the false representation must concern a "past or existing material fact." In other words, "fraud cannot be predicated on statements which are promissory in their nature." At the time Plaintiff was hired, Defendants offered her present employment, which was fulfilled. The record does not indicate that Plaintiff was to be employed with Gucci for a definite time period. In fact, the terms of Plaintiff's employment were clearly "at-will ." Therefore, it is undisputed that Defendants did not make any false statements of material fact. Accordingly, the circuit court correctly granted summary judgment in favor of Defendants.

### E. Intentional Infliction of Emotional Distress

 Finally, Plaintiff contends that the circuit court erred in granting summary judgment in favor of Defendants with respect to the issue of intentional infliction of emotional distress. We have previously stated:

> Recovery for intentional infliction of emotional distress is permitted only if the alleged tortfeasor's acts were "unreasonable." *Calleon v. Miyagi*, 76 Hawai'i 310, 321 n. 7, 876 P.2d 1278, 1289 (1994), *as amended*, 76 Hawai'i 453, 879 P.2d 558 (1994); *Chedester v. Stecker*, 64 Haw. 464, 467, 643 P.2d 532, 535 (1982); *Marshall v. University of Hawaii*, 9 Haw.App. 21, 38, 821 P.2d 937, 947 (1991). *An act is "unreasonable" if it is " 'without just cause or excuse and beyond all bounds of decency* [.]' " *Chedester*, 64 Haw. at 468, 643 P.2d at 535 (quoting *Fraser v. Blue Cross Animal Hosp.*, 39 Haw. 370, 375 (1952)). In other words, the act complained of must be "outrageous," as that term is employed in the Restatement (Second) of Torts § 46 (1965). *Id.*

> "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." *Wong v. Panis*, 7 Haw. App. 414, 421, 772 P.2d 695, 700 (1989)

(citing Restatement (Second) of Torts § 46 comment h). *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc.*, 76 Hawai'i 454, 465, 879 P.2d 1037, 1048 (1994) (emphasis added) (footnote omitted). In addition, "mental distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rodrigues v. State*, 52 Haw. 156, 173, 472 P.2d 509, 520 (1970).

In this case, Plaintiff maintains that "the shouting and abusive manner which Perreira displayed toward Plaintiff" gave rise to intentionally inflicted emotional distress, which caused "[h]er blood pressure [to rise] significantly ... [and caused her] difficulty sleeping." Opening Brief at 34. Specifically, Plaintiff complains of a "vicious" verbal attack during which Perreira yelled, "You have to start doing your job" and slammed down the phone when Plaintiff inquired why Perreira was being rude. In addition, Plaintiff took exception to Perreira singling her out on three or four occasions and directing her to wear more makeup because "[Gucci is] aiming for a much younger look." On yet another occasion, Perreira allegedly chastised Plaintiff in front of other employees about her attire and need to comb her hair.

Under these circumstances, we cannot declare that Perreira's actions were "without just cause or excuse *and* beyond the bounds of decency"; nor can we say that a reasonable person would be unable to adequately cope with Perreira's verbal criticism of and reprimands regarding Plaintiff's job performance. Although Plaintiff may have resented the tone and substance of Perreira's criticisms, we can hardly classify such remarks as "outrageous" or "beyond the bounds of decency." Accordingly, we hold that the circuit court correctly granted summary judgment in favor of Defendants.

### IV. CONCLUSION

For the reasons discussed above, we affirm the circuit court's judgment.